# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2008

Charles R. Fulbruge III
Clerk

No. 06-20774

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VICTOR RODRIGUEZ,
Also Known as Victor Sanchez Rodriguez, Also Known as Don Victor;
ROSA MARIA SERRATAZ,
Also Known as Rosa Maria Armijo, Also Known as Rosa Maria Gonzalez,
Also Known as Rosa Maria Serrato-Armijo,
Also Known as Rosa Sarrata Gonzales;
EMMA SAPATA RODRIGUEZ,
Also Known as Emma Sapata Rodriguez, Also Known as Dona Emma,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, GARWOOD and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Victor Rodriguez ("Victor"), Emma Sapata Rodriguez ("Emma"), and Rosa

Maria Serrataz ("Serrata")[1] appeal convictions related to their participation in a scheme to transport a large number of illegal aliens across the Mexican border. We affirm.

## I. Introduction
### A. Facts
#### 1. The Smuggling Conspiracy

The government alleged that Victor, Emma, and Serrata were part of a loose organization of illegal-alien smugglers, or "coyotes," operating in South Texas. Within that organization, their function was to pick up Latin American illegal aliens who had already come as far as the Mexican border, bring them across the Rio Grande River into the area of Brownsville, Texas, shelter them for short periods of time, and hand them over to other coyotes responsible for transporting them north to Houston.

The plan was orchestrated by Karla Chavez-Joya, a Honduran living in the United States, who connected coyotes such as Victor, Emma, and Serrata to others who would escort the aliens northward. Typically, it appears, Chavez-Joya arranged for groups of aliens to be loaded into a truck trailer, driven through the immigration checkpoint near Sarita, Texas, and transferred into vans that would take them to Houston. Abelardo Flores, Jr., recruited drivers for Chavez-Joya, looking especially for non-Hispanic drivers with non-Texas license plates. One such driver was Tyrone Williams, who agreed in early May 2003 to transport a number of aliens in his truck trailer for a fee. The pickup site for the run was to be near Harlingen, Texas, and the present defendants were among the coyotes who funneled the aliens into the United States. Of note here are the illegal aliens brought across the border by Victor, Emma, and Serra-

---

[1] The record contains multiple spellings of this name. We use the version in the indictment.

ta.

## 2. Victor and Emma

The aliens who testified against Victor and Emma told similar stories. They began their journeys in their native countries, where they hired local smugglers to bring them north to Matamoros, Mexico, just across the Rio Grande from Brownsville. There, the aliens typically contacted Victor and Emma at phone numbers provided by the local smugglers, though at least one alien met with Victor in Mexico. Victor, workers of his, or his son with Emma, Victor Jesus Rodriguez ("Victor Jesus"), then escorted the aliens across the river in inflated tubes and took them to Victor and Emma's house. The one exception was a small boy deemed too weak to cross the river in that way; he was brought through the border checkpoint by Emma, bearing her grandson's identification papers, along with a number of other small children whom Emma instructed to refer to the boy as their brother.

Once across the border and in Victor's and Emma's hands, the aliens made financial arrangements for transportation north to Houston. In each case, Victor and Emma demanded payment of approximately $2000, with half payable immediately and the remainder payable when the alien reached Houston. Victor and Emma typically gave the aliens access to phones for calling relatives to arrange wire transfer of the payment.

After the Rodriguezes received the first installment, they secreted the aliens in a series of houses, trailers, and sheds in and around Brownsville, sometimes with their respective parties, sometimes together with other illegal aliens brought into the United States by the Rodriguezes or others. Most ominously, a number of aliens reported being kept for some time in a densely crowded house with no room to sit down or sleep. Some of them called the Rodriguezes to complain about the conditions there, and the Rodriguezes moved them out of the

house for a night.

There was discussion, naturally, of the means of transportation. The aliens were typically offered a choice between going north on foot or riding in a truck. Victor and Emma steered the aliens, even ones who initially preferred to walk, in the direction of the truck, saying they would be safer, move faster, and be harder to detect. A number of them expressed concern with riding a long distance in a truck trailer, but Victor and Emma assured at least six of them that they would be riding in the truck's cab, not the trailer. At least one alien left his conversation with Victor under the impression that the truck would take him directly to Houston with no stopping.

Ultimately, the relevant aliens smuggled by Victor and Emma, together with a large number of others, were brought in vans—some by Victor Jesus personally—to an increasingly crowded field outside Harlingen late at night on May 13, 2003. Despite Victor's and Emma's assurances that several of their aliens could ride to Houston in the truck's cab, none of the Rodriguezes stayed at the loading area or made any other effort to separate their aliens from the others; Flores, who loaded the trailer, stated that he had never heard of Victor or Emma at the time. Victor and Emma reserved the minor alien from the trailer trip, apparently planning to send him to Houston separately.

### 3. Serrata

Meanwhile, Serrata was smuggling an alien of her own. In previous years, she had run an extensive alien-smuggling operation that included her sons, Antonio Gonzales ("Antonio") and Ramiro Gonzalez [sic] ("Ramiro"), and a number of others. She was close to Victor and Emma and had raised her sons to believe that Victor and Emma were their uncle and aunt, though in fact there was no family relationship. Her sons reported at trial, however, that she had since entered a sort of semi-retirement, working in her house as a hairdresser and leav-

4

ing the business of human trafficking to her sons and to Octavio Torres-Ortega (usually referred to as "Tavo"), a former worker of hers. As of May 2003, Antonio and Ramiro typically worked with Tavo (though Antonio reported having smuggled aliens with Victor and Emma). But when Jose Roldan Castro ("Roldan") contacted her, she took it upon herself to have him smuggled into the United States.

Roldan approached the Mexican border much as did the other aliens but was put in touch with Serrata. Roldan's brother at some point sent Serrata $1000, ostensibly to be passed along as a bribe for the border guard (though there was no evidence of a bribe). Serrata crossed the border, met Roldan, and set up a convoluted series of exchanges, secret signals, and car rides from place to place that eventually took him into the United States, where Serrata met him again and took him to her house. Roldan stayed at Serrata's household for some time, meeting Antonio and Ramiro and eating with all of them at the family table. When Tavo visited Serrata, she introduced him to Roldan as the man who would take him to Houston.

Serrata demanded another $850 from Roldan for travel to Houston. Roldan's brother sent that money to Serrata as well; she gave it to Roldan to give to Tavo. Eventually she handed Roldan over to Tavo, who deposited him with the crowd of aliens being readied for transportation in Williams's trailer.

Roldan was under the impression that Serrata and Tavo were working together in some way to arrange his transportation north. Tavo told Roldan he would be taken to Houston by trailer. Roldan doubted the safety of that plan and told Tavo, but Tavo said the ride in the trailer would be short and that the aliens would be transferred to vans after the checkpoint. Roldan was taken to the loading site on May 13 as well.

Antonio and Ramiro worked for Tavo regularly and were to assist him in escorting the aliens north. Antonio typically assisted Tavo by picking up aliens

unloaded from trailers that passed the checkpoint and driving them the rest of the way to Houston. Ramiro's usual function was to pick up impounded vehicles and return them to Tavo, but on this occasion he was to drive aliens to Houston with his brother.

Tavo procured vans for them to drive and instructed them to meet him. As they understood their job, they were to drive north, meet the trailer, load the aliens into their vans, and continue the rest of the way north to Houston. Late at night on May 13, Antonio and Ramiro woke their mother and told her to take them to meet Tavo at a parking lot. She agreed, drove them to the meeting place, and left them there with instruction to "be careful." Antonio said that Serrata briefly spoke with Tavo there. Tavo gave Antonio Chavez's phone number and told him to coordinate the details of the transfer with her.

### 4. The Trailer

Williams's truck arrived at the field near Harlingen after dark, and Flores herded the more than seventy aliens into the trailer. Flores instructed Williams to set the trailer's refrigerator at fifty-five degrees, and Williams acknowledged. Some of the aliens brought by the Rodriguezes knocked on the passenger side of the cab, expecting to be let in for the ride, but the door did not open; they had to rush into the trailer before the doors were closed.

The pickup site near Harlingen is a drive of about one hour and forty-five minutes from the Sarita checkpoint, which is just south of Robstown on US-77. The place where the trailer was eventually found was just south of Victoria on US-77, more than another two hours further. During the more than three-hour drive, the trailer doors did not open. The trailer had a refrigeration device, but Williams never turned it on. Even if the refrigeration unit had been running, it would only have circulated air inside the trailer; it would not have brought fresh air to the aliens packed inside.

The testifying aliens gave harrowing accounts of their time inside the trailer. The temperature rapidly increased, and they soon had difficulty breathing. Panic set in before long, as they came to fear for their lives; they began removing their clothing, and some eventually resorted to sucking the perspiration off their own garments. Though they broke out the trailer's tail lights to bring in more air, they found themselves suffocating. Someone passed a few bottles of water through the holes at some point, but not nearly enough for the people inside.

While this scene was unfolding inside the trailer, Antonio and Ramiro were driving north, in the cars provided by Tavo, planning to meet the trailer and pick up the aliens near Robstown. After some time driving, Tavo called to say that Ramiro should turn back and go home, his services no longer needed. Antonio and Chavez-Joya then had a series of phone conversations in which she pushed the meeting site farther and farther north, eventually as far as Victoria.

Just south of Victoria, Williams stopped the truck, disconnected it from the trailer, opened the trailer door, and drove away. The insulation on the trailer's inside walls, by that time, was covered with bloody marks from the fingernails of the desperate aliens. The police, who arrived on the scene early in the morning of May 14, found seventeen dead aliens in and around the trailer, with survivors looking on in a daze. (Other aliens had been strong enough to flee the scene but were apprehended.) Two more died later in the hospital.

The medical examiner who performed the autopsies reported that most of them had died from suffocation, dehydration, and hyperthermia. An alien who expired at the hospital after having been evacuated from the scene had died of hyperthermia alone. The one exception was a five-year-old boy who had died of (in addition to dehydration and hyperthermia) mechanical asphyxia, that is, who had been unable to breathe in the physical crush inside the trailer.

## 5. Aftermath

By the time Antonio caught up with the trailer in the outskirts of Victoria, the police were on the scene. Chavez-Joya, after he called her, told him to leave; he checked into a nearby hotel to watch the news. Meanwhile, Serrata woke up her son Ramiro in tears, saying that she had "a person" on the trailer and that she had seen news reports of its fate. Ramiro, at trial, said that she seemed to know that he and Antonio had been involved with that trailer. Shortly afterward, Victor and Emma's botched attempt to deliver the minor alien led to the arrest of a coyote in their circle.

The principal players made immediate efforts to flee the country. Chavez-Joya prepared to leave for Honduras; Serrata went to Mexico soon afterward. Later on the day of her departure, Victor and Emma came to Serrata's house, obviously agitated, speaking with concern about the arrest of their associate and asking for help getting to a house they owned in Mexico. Ramiro and Antonio drove them there.

## B. Procedural History

### 1. Indictment, Trial, and Conviction

A superseding indictment charged Victor, Emma, and Serrata[2] with conspiracy to conceal, harbor and shield from detection, and to transport "from a location at or near Harlingen, Texas to another location at or near Victoria, Texas, and other places," thirty-eight named illegal aliens "by means of a semi-tractor trailer rig, for the purpose of commercial advantage and private financial gain," all in violation of 8 U.S.C. § 1324(a)(1). The indictment further charged that "during and in relation to said violation, the defendants caused serious injury to

---

[2] Several other individuals, including Chavez-Joya, Flores, Tavo, Williams, and Victor Jesus, also involved with planning and executing the events, were indicted together with the three defendants but did not reach trial or were tried separately. See, e.g., United States v. Williams, 449 F.3d 635 (5th Cir. 2006).

a person, placed in jeopardy the life of a person, and the death of a person result-ed."

Counts 2 through 20 charged Victor, Emma, and Serrata with aiding and abetting the harboring conspiracy charged in count 1 with respect to nineteen aliens; counts 21 through 39, with aiding and abetting the transportation con-spiracy with respect to those aliens; and counts 40 through 58, with aiding and abetting the transportation of the nineteen other aliens. Lastly, the superseding indictment charged Victor and Emma with aiding and abetting the harboring (count 59) and transportation (in count 60) of the minor alien.

The district court ordered acquittal as to Victor and Emma on a number of counts, leaving in place indictments for conspiracy to harbor and to transport the thirty-eight aliens (count 1), for aiding and abetting the harboring of certain aliens (counts 3, 11, 13-17), for aiding and abetting the transportation of certain aliens (counts 22, 30, 32-36, 42, 43, 58), and for harboring and transporting the minor alien (counts 59 and 60). The court also ordered acquittal as to Serrata for all counts except conspiracy (count 1) and aiding and abetting the harboring (count 8) and transportation (count 27) of Roldan.

The jury convicted Victor, Emma, and Serrata of the conspiracy charged in count 1. It returned a special finding that the conspiracy had involved be-tween twenty-five and ninety-nine aliens. It convicted Victor of all remaining harboring counts (that is, again, counts 3, 11, and 13-17), several transportation counts (counts 22, 30, 32-36, and 58), and for the counts relating to the minor ali-en (counts 59 and 60). Victor was acquitted on counts 42 and 43 (dealing with transportation). Emma's conviction was the same, except that she was acquitted of counts 30, 32, and 33. In convicting Victor and Emma on counts 1, 16, 35, and 58, the jury found that at least one illegal alien "was caused serious bodily in-jury." It did not find, though, that any aliens had been "placed in jeopardy of death" or had died. Serrata was convicted of the count 1 conspiracy, including

the special finding as to the number of aliens involved, and of aiding and abetting the Roldan's harboring (count 8), but not guilty of aiding and abetting his transportation (count 27).

## 2. Sentencing

The district court applied various sentencing enhancements. Relevant here are the two-level enhancements for intentionally or recklessly creating a substantial risk of serious bodily injury and the eight-level enhancements because the death of an alien resulted. The court calculated Victor's offense level to be 37, yielding a sentencing guideline imprisonment range of 210 to 262 months. The court made an upward departure, sentencing Victor to 280 months. Emma's offense level was 31. The court upwardly departed from her guideline range of 108 to 135 months, sentencing her to 180 months. Serrata's offense level was 32, and the court sentenced her to 151 months with no departure. The court also ordered Victor, Emma, and Serrata each to serve three-year terms of supervised release and imposed $1800, $1500, and $200 (respectively) in special assessments.

## C. Issues on Appeal

The three defendants appealing here assert five overlapping grounds for reversal of their convictions or for resentencing. First, Victor and Emma claim that the evidence presented at trial was insufficient to support a conviction of conspiracy. Second, they claim that the evidence was insufficient to support their convictions of the substantive offenses of harboring or transporting. They do not challenge the sufficiency of the evidence for their convictions related to the minor alien.

Third, Serrata claims that there was a material variance between the conspiracy alleged in her indictment and the one actually proven at trial. Fourth,

Victor and Serrata claim that the court incorrectly applied certain sentencing enhancements. Fifth, Victor and Emma claim the court erred in granting the government's motions for upward departures from their guideline sentences.

## II. Evidence-Related Claims

### A. Victor and Emma—Sufficiency of the Evidence

#### 1. Standard of Review

In considering whether there is sufficient evidence to support a verdict, this court asks only whether the jury's decision was rational, not whether it was correct. United States v. Lopez-Urbina, 434 F.3d 750, 757 (5th Cir. 2005). We examine the record to determine whether "any reasonable trier of fact" could have reached the jury's conclusion, beyond a reasonable doubt, on all elements of the crime. United States v. Martinez-Lugo, 411 F.3d 597, 599 (5th Cir. 2005) (per curiam). We must therefore consider all evidence and all reasonable inferences therefrom in the light most favorable to the prosecution. Id.

#### 2. Conspiracy

Victor and Emma argue, first, that though there may have been evidence that they participated in a conspiracy to transport illegal aliens to Robstown, there was insufficient evidence to convict them of participation in a conspiracy to transport to Victoria, as stated in the indictment. They claim that they expected the truck to stop in Robstown and transfer the aliens to vans waiting there, which would have continued the aliens' passage north, and that therefore the defendants' involvement with the conspiracy to transport aliens would be at an end after the aliens had passed Robstown. Victor contends that his involvement with the aliens and other coyotes amounted to "isolated transactions" insufficient to show a conspiracy.

The district court gave the jury a multiple conspiracy instruction, which

is generally considered sufficient to cure any risk of confusion caused by differences between the conspiracy alleged and the conspiracy proven. United States v. Pena-Rodriguez, 110 F.3d 1120, 1128-29 (5th Cir. 1997). If the jury had found evidence sufficient only to prove the lesser conspiracy of transporting the aliens to Robstown, it had been instructed to find Victor and Emma not guilty.

The government presented ample evidence to allow a rational jury to conclude that Victor and Emma were part of a single conspiracy to transport the aliens not just to Robstown, but all the way to Houston. Many of the aliens testified, for example, that their full payment would not be due to Victor and Emma before they reached Houston. Some even believed, after speaking with Victor, that the trailer would take them directly to Houston without any transfer.

It therefore strains credulity to suggest that Victor and Emma would have no interest in the aliens past Robstown or that they would have been somehow unconnected to the continued transportation further north. At a minimum, Victor and Emma would have been indifferent as between the truck's stopping in Robstown and continuing beyond, as long as they expected to get paid. Proof of Victor's and Emma's "involv[ment] in a broad project" to transport the aliens to Houston, where the "benefit [of the defendants] depended on the success of the operation," see United States v. Shabani, 48 F.3d 401, 403 (9th Cir. 1995), and where "success . . . depended on the continued willingness of each member to perform his function," see United States v. Morris, 46 F.3d 410, 416 (5th Cir. 1995), was sufficient for a conviction under this indictment.

Moreover, though Victor and Emma negotiated with the aliens for transportation to Houston and depended on the aliens' transportation to Houston for their full payment, they did not intend to take any aliens to Houston themselves. Instead, they kept custody of a number of aliens while others made arrange-

ments for the trailer.[3] The evidence shows that, having seen to it that their aliens reached the loading site, Victor and Emma were unconcerned with the further details of transporting them, so long, again, as they were fetched and somehow taken to Houston.

Neither Victor nor Emma, nor even Victor Jesus, stayed at the site to confirm that the aliens had been loaded; they were evidently confident that other individuals would come along to ensure that their end of the bargain with the aliens would be kept. This necessarily implies agreement and concerted action. The actions of Flores, Williams, and Chavez-Joya in arranging for and performing the pickup complemented the actions of the Rodriguezes in smuggling aliens into the country, holding them for various periods of time, and bringing them to the pickup site for transport.[4] They were therefore working in concert with others, see United States v. Mitchell, 484 F.3d 762, 769 (5th Cir.), cert. denied, 128 S. Ct. 297 (2007), in pursuit of common goals for personal gain, see Morris, 46 F.3d at 415. This is the essence of a conspiracy.

The defendants do not explain, on appeal, why the trailer's going further than Robstown would have been inconsistent with the conspiracy they joined. The evidence that trailers typically unloaded aliens for transfers to vans at Robstown is not dispositive. Antonio's testimony indicated that Tavo and Chavez-Joya retained discretion to change the details of the transfer from the trailer to

---

[3] There was, in addition, phone-record evidence of coordination between Victor and Chavez-Joya and Tavo. Victor and Emma had worked with Tavo in the past. The fact that aliens smuggled by Victor and Emma were housed at times with those brought by other coyotes indicates coordination, as well.

[4] Conspiracy law contemplates the existence of subgroups. Provided that there is an overall agreement with consistent ultimate purposes, subagreements are in no way inconsistent with a conspirator's liability. Shabani, 48 F.3d at 403. The existence of such subgroups can contribute to a finding of a conspiracy. See Morris, 46 F.3d at 416 (inferring conspiracy when there are "several parts inherent in a larger common plan" and "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture") (citing United States v. Elam, 678 F.2d 1234, 1246 (5th Cir. 1982)).

vans, and no evidence would have supported the inference that Victor and Emma counted on a transfer at Robstown. Again, the aliens negotiated with Victor and Emma for transportation directly to Houston. In light of this evidence, there is no support for Victor and Emma's effort to distinguish their conspiracy from the larger conspiracy to transport the aliens all the way to Houston. There was sufficient evidence, in short, for the jury to infer that Victor and Emma were members of a single conspiracy.

### 3. Aiding and Abetting

Victor and Emma contend there was insufficient evidence to support their convictions of the substantive counts of aiding and abetting.[5] Victor claims that because he did not intend the aliens to be transported past Robstown, the jury could not have found him responsible for causing serious bodily injuries in the course of his substantive offenses. Emma argues that there was insufficient evidence to convict her of substantive offenses other than harboring and that her substantive convictions of transportation should be reversed.

"Typically, the same evidence will support both a conspiracy and an aiding and abetting conviction." United States v. Singh, 922 F.2d 1169, 1173 (5th Cir. 1991). Emma's claim is meritless, considering the testimony of aliens who negotiated with her directly for transport in the trailer. Victor's is disposed of, in general, by the same token as is his argument against his conspiracy conviction.[6]

---

[5] "[T]o prove the crime of aiding and abetting, the Government must establish that the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." United States v. Pando-Franco, 503 F.3d 389, 394 (5th Cir. 2007), cert. denied, 128 S. Ct. 1874 (2008).

[6] Even if Victor conspired to transport the aliens only as far as Robstown, there would still be no need to question the jury's special finding. The testimony indicates that within just one-half hour, the aliens were suffering from extreme heat and having
(continued...)

## C. Serrata—Material Variance

### 1. Standard of Review

"A material variance occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." Mitchell, 484 F.3d at 769 (internal quotation marks omitted). The law concerning material variances exists to protect defendants from the government's presenting evidence that shows the defendant's participation in a crime of the same type alleged in the indictment, but on significantly different facts. Specifically, material variances place defendants at risk of being unable to prepare their defenses or of double jeopardy. United States v. Thomas, 12 F.3d 1350, 1357 (5th Cir. 1994).

To prevail on this claim, Serrata must establish (1) that "proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense," in other words, the material variance, Mitchell, 484 F.3d at 769; (2) that the variance "prejudiced the defendant's substantial rights" including the right to notice of charges and the right to freedom from double jeopardy, id.; United States v. Guidry, 406 F.3d 314, 322 (5th Cir. 2005); and (3) that, given adequate evidence to find that the defendant participated in a conspiracy, there was "reversible error under general principles of joinder and severance," Mitchell, 484 F.3d at 770-71. The adequacy of evidence is evaluated according to the rational-jury standard discussed above in connection with Victor and Emma. Id. at 769.

---

[6] (...continued)
difficulty breathing and that it would have taken nearly two hours to drive from Harlingen to Robstown. There is an obvious inference that substantial bodily injuries were inflicted on the drive between Harlingen and Robstown.

## 2. Analysis

Serrata claims there was a variance between the conspiracy alleged in the indictment and what she says is the smaller conspiracy the government could have proved that she participated in. Serrata concedes that the evidence was sufficient to convict her of at least one conspiracy, and a multiple-conspiracy instruction was given.[7] Serrata, furthermore, has not carried her burden on any of the necessary elements.

First, Serrata has not demonstrated a variance at all. Whether the evidence related to her in fact established her participation in a single, broad conspiracy or in one of multiple conspiracies is, of course, a question for the jury. Her material variance claim, as a result, largely turns into yet another argument as to sufficiency of evidence and fails on consideration of the evidence.

Serrata raises two points on which she claims the evidence was insufficient: first, that she was aware the illegal aliens would be transported by trailer, and second, that she knew how many aliens would be smuggled. Given that lack of knowledge, she asserts, there was sufficient evidence to convict her only of conspiracy to transport Roldan into the United States and hand him off to Tavo but not of participation in the conspiracy to transport many aliens to Houston.

The government presented evidence tending to show that Serrata assisted in crossing Roldan into the United States, accepted money for her work, housed him for several days, and demanded additional money from Roldan's brother for trailer transportation. Roldan was evidently under the impression, after talking to Serrata, that he would be sent by trailer straight to Houston. This flatly contradicts Serrata's assertion in her brief that she did not know the aliens would be transported by trailer and suggests, at the very least, that she was aware of her role in a larger plot to carry aliens well past Robstown.

---

[7] See Pena-Rodriguez, 110 F.3d at 1128-29 (noting that there is no joinder-and-severance prejudice under such circumstances).

Testimony indicated that Serrata had worked with Tavo before and that she knew he would be responsible for getting Roldan onto the trailer that Roldan had discussed with her. The jury could easily have inferred that she was familiar with alien-smuggling practices. She brought her sons to Tavo so they could help him with the trailer and knew, when the trailer was discovered, that Roldan had been on it. Victor and Emma came to her house afterward for help escaping the country.

Although Antonio testified that Serrata was not involved with Tavo, the jury was at liberty to disbelieve that, especially in light of her handing Roldan over to him, taking her two sons to help him, and talking to him on the night in question. Nor would it have been unreasonable for the jury to conclude that Serrata knew Roldan would be in the trailer with many other aliens supplied by other coyotes; this too would have suggested that she was part of a conspiracy with individuals whom she may not have known precisely.

Serrata's dealings with Antonio, Ramiro, and Tavo relating to Roldan were sufficient to support the jury's conclusion that she was connected to the broader conspiracy.[8] Her actions do not support her claim that the government proved only her involvement in a "smaller" conspiracy. There was ample evidence for the jury to decide that Serrata shared a common goal with Victor, Emma, and the other conspirators. Her actions were advantageous to those of other conspirators and complemented them in a way that bespeaks both coordination and awareness of the scale of the operation. Just as Victor and Emma could rationally have been convicted of membership in the general conspiracy to transport ali-

---

[8] See Thomas, 12 F.3d at 1357 ("[A] jury may find a defendant guilty of conspiring with unknown persons where a sufficient overlap of personnel occurs—i.e., if a pivotal figure . . . directs and organizes the illegal activity, and has extensive dealings with each of the parties. Thus, parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy, even in the absence of contact with other conspirators.") (quotation marks and citations omitted).

ens to Houston, so could Serrata.[9]

Second, even if there were a variance between the indictment and the evidence, Serrata would have to show the "materiality" of the variance, compromising her "substantial rights," deriving either from a risk of surprise at trial or a risk of double jeopardy. See Guidry, 406 F.3d at 322; United States v. Robles-Vertiz, 155 F.3d 725, 729 (5th Cir. 1998). Serrata has not claimed that she was surprised at trial and has not suggested any risk of surprise.

Serrata does claim to have suffered from a "species" of double jeopardy at sentencing, in that her offense level was increased as a result of the nineteen deaths; she could not have been subject to that increase, she asserts, if she had been convicted only of participation in a smaller conspiracy. This claim has nothing to do with double jeopardy, and Serrata cites no authority suggesting otherwise. The "prejudice" she asserts, in fact, amounts to little more than complaints about the sentencing guidelines, which permit the very sentencing enhancements Serrata objects to.[10] At any rate, those enhancements, having been determined by the court at sentencing, were subject only to a preponderance-of-the-evidence standard. See id.

Third, even if Serrata has demonstrated a variance compromising her substantial rights, she must also show a particular form of prejudice. Prejudice, in the context of variances, is evaluated according to "general principles of joinder and severance." See Mitchell, 484 F.3d at 770-71. Where the indictment alleged

---

[9] "Even where the evidence points to multiple conspiracies rather than the single conspiracy charged in the indictment, the variance does not affect the defendant's substantial rights as long as the government establishes the defendant's involvement in at least one of the proved conspiracies." Mitchell, 484 F.3d at 770.

[10] See U.S.S.G. § 1B1.1, comment. (n.1(H)) (2005); see also United States v. Jimenez, 509 F.3d 682, 693-94 (5th Cir. 2007) ("Uncharged conduct can be relevant to sentencing where there are common accomplices, a common purpose, a similar modus operandi, or where the conduct is part of an ongoing series of offenses.") (internal quotation marks omitted), cert. denied, 128 S. Ct. 2924 (2008).

a single conspiracy and there is sufficient evidence to establish the defendant's participation in "at least one conspiracy," a court will not find that his substantive rights have been violated without a showing of "reversible error under general principles of joinder and severance." See id.[11]

Serrata filed a pretrial motion for severance, which the court rejected. Because she has not objected on appeal to being tried with Victor and Emma, we need not consider whether joinder and severance principles would aid her. But in any case, there is no question that Victor, Emma, and Serrata were properly indicted together. See FED. R. CRIM. P. 8(b); United States v. Maggitt, 784 F.2d 590, 595 (5th Cir. 1986).

"[P]ersons indicted together should be tried together, especially in conspiracy cases." United States v. Miranda, 248 F.3d 434, 439 (5th Cir. 2001) (quoting United States v. Neal, 27 F.3d 1035, 1045 (5th Cir. 1994). Federal Rule of Criminal Procedure 14(a) provides for severance of joined defendants only where joinder "appears to prejudice a defendant or the government." "Prejudice," in this case, means "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). No such risks are evident here,[12] and Serrata's material-variance argument fails as a result.

---

[11] Variance claims are merely a "subset" of joinder and severance law. See United States v. Faulkner, 17 F.3d 745, 762 (5th Cir. 1994). The burden is on the defendant to demonstrate such error. See Pena-Rodriguez, 110 F.3d at 1128 (requiring defendant claiming a material variance to show "specific and compelling prejudice that resulted in an unfair trial").

[12] Indeed, the government elicited testimony from many witnesses emphasizing that they did not know Serrata. It is therefore unlikely that the jury would have been confused among the defendants when evaluating the evidence. The jury in fact acquitted Serrata on one count, showing intelligent consideration of evidence in such cases. See Pena-Rodriguez, 110 F.3d at 1129.

### III. Sentencing

#### A. Victor and Serrata—Application of Sentencing Guidelines

##### 1. Standard of Review

Victor and Serrata object to the application of various sentencing guideline offense level increases. We review de novo the interpretation and application of the guidelines as a matter of law. But we reverse findings of fact in the course of sentencing only for clear error. United States v. Smith, 440 F.3d 704, 706 (5th Cir. 2006).

##### 2. Victor

Victor objects to the two-level increase for intentionally or recklessly causing a risk of death or serious bodily injury and to the eight-level increase for the death of a person,[13] claiming the deaths were unforeseeable and that applying both increases amounts to double-counting. In so doing, Victor retreads the arguments, largely disposed of above, asserting that there was insufficient evidence to show that he could have foreseen the number of aliens who would be in the trailer or how long they would be there. In the context of sentencing, where we review the factual bases of sentence level increases only for clear error, this argument is even weaker than it was as discussed above.

Foreseeability is a question of fact and is therefore reviewed for clear error. United States v. Angeles-Mendoza, 407 F.3d 742, 751-52 (5th Cir. 2005). The district court is free to consider not just the "acts of the particular defendant, but may also consider all reasonably foreseeable acts and omissions of others in furtherance of the jointly taken criminal activity." Id. In light of the evi-

---

[13] Transporting the aliens by trailer, as proven at trial, plainly merits the enhancement for causing a risk of death or injury, provided proof of Victor's recklessness. See United States v. Zuniga-Amezquita, 468 F.3d 886, 889 (5th Cir. 2006) (finding recklessness where aliens were transported under similar conditions). There does not appear to be a mens rea requirement for the death enhancement.

dence discussed above, there is no clear error: There was sufficient evidence for the district court to find that the aliens arranged with Victor for transportation by trailer to Houston. The court could easily have found that Victor misled the aliens who he said would ride in the cab and that transporting human beings in a trailer bore many foreseeable risks, including the ones that actually materialized.[14]

Victor's double-counting argument is incorrect, for the risk and occurrence of death are quite obviously different. In any event, this argument amounts to quibbles with the statutory sentencing regime, which this court has no authority to pursue. There is no double-counting where some aliens suffered serious bodily injury and ran a substantial risk of death, and others actually died.

## 3. Serrata

Serrata objects to the eight-level increase for involvement in a crime where at least one person died. She takes issue with the district court's factual conclusion that she was a member of the "Rodriguez organization." She argues instead that her involvement in the smuggling operation was limited to assisting Roldan across the river and housing him temporarily; she also notes that she was acquitted of a transportation count and that the jury did not find her guilty of causing the deaths of the aliens. Given, she claims, insufficient evidence to show that she worked for Victor and Emma or that she was aware that aliens would be transported by trailer past the immigration checkpoint, she should not have been subject to this sentence increase.[15]

---

[14] See United States v. Sanchez, 484 F.3d 803, 806-09 (5th Cir. 2007) (finding foreseeability under similar circumstances), vacated on other grounds, 128 S. Ct. 864 (2008).

[15] Serrata notes that the jury acquitted her of responsibility for causing deaths or serious bodily injury. This is beside the point, because the court applies a lesser burden of proof at sentencing than does the jury in deciding guilt or innocence. United States v. Duhon, 541
(continued...)

Both of these claims amount to arguing that Serrata was insufficiently connected to the other conspirators to share responsibility now; her contention therefore resembles the sufficiency arguments disposed of in the context of her material-variance claim. Her argument that she was not involved in getting the aliens past the Sarita checkpoint and past Robstown holds no water. Considering that she served as a conduit for payment for Roldan's passage north; told Roldan that Tavo would be taking him north by trailer; took her sons to assist Tavo with the trailer shipment of May 13; knew that Roldan was on the trailer after it was discovered (and admitted to Ramiro that she felt responsible for his being there); and fled to Mexico afterward, we can hardly conclude that the district court clearly erred in finding that she was sufficiently connected to the conspiracy and aware of how Roldan would be transported. See Sanchez, 484 F.3d at 806-09.

## B. Victor and Emma—Upward Departures

### 1. Standard of Review

The Supreme Court has mandated a two-step process for review of sentences imposed pursuant to the guideline. The reviewing court must first determine whether the district court was procedurally correct in calculating the base sentence, and then determine whether the sentence actually imposed was an abuse of discretion. See Gall v. United States, 128 S. Ct. 586, 594, 596-97 (2007). There is no presumption of unreasonableness for sentences outside the guideline range, id. at 595, but the sentencing court must provide a "sufficient justification." Id. at 597.

Victor and Emma assert no procedural irregularities. We therefore review the upward departures for abuse of discretion.

---

[15] (...continued)
F.3d 391, 395-96 (5th Cir. 2008).

## 2. Analysis

Victor and Emma claim that the adjustments to their base offense levels (specifically, defendants claim, the nine-level adjustment for the number of aliens transported and the eight-level adjustment for the occurrence of a death) accounted for the numerosity of deaths to the maximum legally possible extent and that the upward departures were therefore abuses of discretion. This, however, is plainly incorrect.

The nine-level adjustment took the number of transported aliens into account, but not the number of deaths; the eight-level adjustment accounted for death, but not the number of deaths past one. Notwithstanding the defendants' assertion that the guidelines "make[] no specific provision for numerosity in regard [sic] to death or serious injury," they in fact expressly contemplate upward departures where multiple deaths occur, see U.S.S.G. § 5K2.1, or otherwise to take into account circumstances not adequately incorporated into the guidelines, see id. § 5K2.0(a)(3). The upward departure was imposed, as the district court explained, to take into account eighteen deaths not otherwise provided for. There is no abuse of discretion.

Emma makes a particular point of discussing statistics regarding persons of her age and with her history of criminal convictions; she purports to demonstrate that the upward departure does not serve the goals of "deterrence or incapacitation." We do not see the relevance of such data. For one thing, the statistics she cites are barely probative of her case at all, ignoring as they do the evidence (both at trial and in her presentence report) of a long additional history of uncharged illegal-alien-smuggling offenses. Nor, it appears, are her data specific to the offense charged; instead, it covers recidivism for the whole panoply of federal criminal offenses, so it tells us next to nothing about whether Emma posed a risk of recidivism. Even if this data were in some way relevant to the incapacitation purpose, the court expressly based its upward departure not just

on incapacitation but, in essence, on retribution for the seriousness of the offense. As discussed above, the record richly supports an upward departure on those grounds, and the statute expressly authorizes it.[16]

For the reasons set out above, the judgment of conviction and sentence is AFFIRMED.

---

[16] See 18 U.S.C. § 3553(a)(2) (stating that a sentencing court should consider, besides incapacitation, "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense").