# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-60843

United States Court of Appeals
Fifth Circuit
**FILED**
March 14, 2018
Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

GREGORY P. WARREN, also known as Greg Warren; THI HOUNG LE, also known as Kristy Le,

      Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi
USDC No. 1:15-CR-65-4

Before DAVIS, HAYNES, and COSTA, Circuit Judges.

PER CURIAM:*

      Kristy Le and Gregory Warren were the only two defendants convicted in a seven-person conspiracy case. The primary focus of the Government's indictment, Mikal Watts,[1] was a prominent plaintiffs' attorney who elected to

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] This appeal features defendants with similar names, posing potential confusion. Kristy Le (who was convicted and now appeals) and Wynter Lee (acquitted) will be referred to by their full names. Mikal Watts and David Watts (both acquitted) will be referred to by their first names.

represent himself pro se.  The Government contended that the defendants knowingly used misappropriated social security numbers for litigants they were supposedly representing in a mass tort action against BP.  Mikal and other defendants, however, argued they had been duped by Kristy Le and Warren and unwittingly used the social security numbers in good faith. Five days into the four-week trial, Kristy Le requested that the court sever her trial from the other defendants' trial.  The court denied the motion and informed Warren that if he wanted the court to consider severance as to him, he would need to file a motion.  He never did.

Kristy Le and Warren now challenge the district court's decision not to sever their trials from the rest of the defendants' trial.  Warren also makes other challenges, including a challenge to his sentence.  We AFFIRM.

## I.    Background

### A. The Government charged a conspiracy with Mikal Watts and his firm the central focus.

According to the Government, the facts of this case began in the wake of the Deepwater Horizon oil spill in 2010.  Numerous potential plaintiffs sought compensation from BP.  Mikal Watts, a plaintiffs' lawyer from Texas, began looking for clients to represent.  Mikal's brother David and Wynter Lee, both non-attorneys at Mikal's firm, managed the administrative side of the case within Mikal's firm.  To build a roll of clients, Mikal went outside the firm to Eloy Guerra who had previously assisted Mikal in locating clients for mass tort litigation.

Guerra in turn contacted Warren and Kristy Le to help him locate clients.  Kristy Le and her sister-in-law, Abbie Nguyen, opened up a shop in Biloxi, Mississippi, to collect names.  In the following months, Mikal arranged for funds totaling over $10 million to be routed to Guerra, Warren, and Kristy Le.  As Guerra, Warren, and Kristy Le began sending profiles of clients who

allegedly signed up, Mikal's firm started noticing problems with the names and social security numbers. For instance, they confirmed at least one of the identities was for an individual who died before the BP spill.

Despite the problems with the profiles, Mikal used his supposed representation of the plaintiffs to benefit himself. The litigation he instigated on behalf of some of his supposed plaintiffs had been joined into a complex, massive multi-district case in the Eastern District of Louisiana. For that case to run efficiently, it had to be overseen by a small number of lawyers, rather than by every single plaintiffs' lawyer who had some stake in the outcome of the case. This small number of lawyers was the Plaintiffs' Steering Committee; members of it, the Government alleged, would ultimately be entitled to a cut of a $600 million attorneys' fees fund. Mikal applied to be on the Steering Committee, touting his representation of "over 40,000 plaintiffs" in the litigation, and he was appointed.

As time went on, it became more and more clear that the profiles of clients that Guerra, Warren, and Kristy Le (with the assistance of her sister-in-law) were sending to Mikal's firm had substantial problems. Despite the increasingly apparent problems, Mikal persisted in the representation and appointment on the Steering Committee, eventually settling for $2.3 billion. When it came time for Mikal's clients to actually submit claims on the settlement, a miniscule amount came forward. Only 786 clients from the 40,000-plus clients submitted claims; only 4 were found to be eligible for payments.

The Government saw in this history of events a conspiracy to use fraudulent and misappropriated social security numbers. It charged seven

No. 16-60843

defendants[2] with conspiring to commit mail fraud, 18 U.S.C. § 1341, wire fraud, *id.* § 1343, identity theft, *id.* § 1028(a)(7), and aggravated identity theft, *id.* § 1028A. The indictment and the Government's opening argument focused heavily on Mikal. Kristy Le and Warren played small roles in the Government's portrayal of the conspiracy.

**B. The Upstream Defendants turned on Kristy Le and Warren in voir dire and opening argument.**

At trial, the Government stuck to its portrayal. But Mikal, David, Wynter Lee, and Guerra—whom we will refer to as the "Upstream Defendants"—did not. Instead of denying the Government's allegations, the Upstream Defendants agreed that Kristy Le and Warren committed criminal fraud but portrayed themselves as additional victims of the fraud rather than co-conspirators.

This version of events first came out when Mikal stood up for voir dire. His first words to the jury panel were, "Good morning, ladies and gentlemen. I'm Mikal Watts. I've got a good deal of questions for you, but I want to start off with following up on something. I was ripped off." Later he distanced himself and his firm from Kristy Le. David's and Guerra's attorneys continued this same theme in their opening statements, saying they were "scammed" and that they would unveil the real fraudsters, Kristy Le and Warren.

Warren's attorney tried to distance Warren from Kristy Le and the field team collecting the names. Kristy Le's attorney, on the other hand, chalked up the problems with the profiles to Kristy Le's inexperience. She had a good faith belief, he argued, that any missing or incorrect information would later be verified by the law firm.

---

[2] Mikal Watts, David Watts, Wynter Lee, Eloy Guerra, Gregory Warren, Kristy Le, Abbie Nguyen.

4

No. 16-60843

By the end of opening arguments the Upstream Defendants' theory was clear: Kristy Le and Warren had scammed them.  Kristy Le and Warren, however, claimed to have no knowledge of misused social security numbers.  The Government, in contrast, contended that everyone knew they were using social security numbers without authorization regardless of who first misappropriated the numbers.

**C. Five days into trial, Kristy Le moved to sever and was denied.**

Five days after opening arguments, Kristy Le moved to sever her case from the other defendants.  Her attorney argued that because the Upstream Defendants' defenses were mutually antagonistic to her own, she would be prejudiced by being tried with them.  The Upstream Defendants would, in effect, become extra prosecutors.  Warren's attorney noted that he planned to file a similar motion on similar grounds.  The district court denied Kristy Le's motion and told Warren's counsel that he would need to file the motion for the court to rule on it.  Warren's counsel never filed such a motion.

Thereafter, the Upstream Defendants continued their drumbeat against Kristy Le and Warren.  In addition to argument, they examined witnesses and called experts to buttress their claim that Warren and Kristy Le were mastermind fraudsters, not them.

Kristy Le would re-raise her motion to sever two more times during trial.  The district court denied the renewed motions both times.

During closing arguments, the Government referenced some of the Upstream Defendants' evidence against Kristy Le. Nearly a month after the case began, the district court charged the jury.  The jury acquitted the Upstream Defendants (Mikal, David, Wynter Lee, and Guerra) on all charges, as well as Nguyen.  They convicted Kristy Le and Warren on all counts.

No. 16-60843

## II.   Discussion

Both Kristy Le and Warren appeal the district court's decision to try them jointly with their co-defendants.  We first address that issue.  We then turn to two remaining issues that Warren alone raises.

### A. Failure to sever.

Kristy Le and Warren argue that the district court erred because it failed to sever their cases from the other defendants.  The default rule is "persons indicted together should be tried together, especially in conspiracy cases." *United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994) (quoting *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993)).  To achieve reversal, a defendant must identify "specific events during trial and demonstrate[ ] that these events caused him substantial prejudice." *United States v. Thomas*, 627 F.3d 146, 157 (5th Cir. 2010) (citing *United States v. Lewis*, 476 F.3d 369, 384 (5th Cir. 2007)).  Prejudice does not mean simply that the defendant had a harder time mounting a defense. *Cf. Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.").  Instead, to show prejudice, a defendant must show that "a joint trial would compromise a specific trial right . . . , or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.  Even when a defendant identifies prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id*.  In sum, Kristy Le and Warren must identify specific instances when their joint trial substantially (a) deprived them of a specific trial right or (b) prevented the jury from making reliable judgments.  If they successfully identify such specific instances, they then must demonstrate that any limiting instructions given were insufficient to cure the prejudice.

No. 16-60843

Kristy Le and Warren argue that their trial with the Upstream Defendants prejudiced them in three ways. First, it subjected them to antagonistic defenses. Second, their co-defendants presented evidence that caused a material variance from the allegations in the indictment. Third, Mikal's comments during his self-representation violated their Confrontation Clause rights. Under the standards of review applicable to each of these arguments, the district court did not commit reversible error.

## 1. Standard of review and error preservation.

Before we address the merits of their arguments, we must first determine what standard of review applies on appeal. We begin with Warren.

Warren has waived any argument for severance. Waiver "occurs by an affirmative choice by the defendant to forego any remedy available to him, presumably for real or perceived benefits resulting from the waiver." *United States v. Dodson*, 288 F.3d 153, 160 (5th Cir. 2002). At trial, the district court explicitly instructed Warren's counsel that to obtain a ruling on whether Warren's case should be severed, he would need to file a motion; he could not rely on any co-defendant's motion to sever. Warren's counsel acknowledged the instruction but ultimately never filed any motion. Such a decision— electing not to file a motion after the district court explicitly instructs counsel he must—amounts to an "affirmative choice" which waives the issue for appeal. Consequently, we need not address Warren's severance arguments.[3]

Kristy Le[4] filed no motion to sever until after the trial began. Under the prior version of Federal Rule of Criminal Procedure 12, upon which many of

---

[3] Even if we were to address Warren's arguments, they would fail. He would receive, at best, plain error review. As the discussion below of Kristy Le's severance argument shows, he cannot succeed under that standard.

[4] In its brief on appeal, the Government never directly argues that Kristy Le forfeited any arguments. But "[a] party cannot waive, concede, or abandon the applicable standard of review." *Ward v. Stephens*, 777 F.3d 250, 257 n.3 (5th Cir. 2015). Consequently, we must

our precedents are based, that delay likely would have been fatal to her appeal. *See, e.g., United States v. Tolliver*, 61 F.3d 1189, 1198–99 (5th Cir. 1995). However, in 2014, Rule 12(b)(3) was amended. It now includes a caveat that motions to sever must be filed before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." FED. R. CRIM. P. 12(b)(3). Rule 12(e), which previously stated the motion was "waived" if not timely filed, was moved to Rule 12(c)(3) and changed to say any late motion was "untimely."

We conclude that Kristy Le timely moved to sever and thus do not reach the question of whether a delay in bringing the motion during trial could result in a forfeiture of the motion to sever. The basis for Kristy Le's motion to sever was that the Upstream Defendants' defenses were antagonistic to her own. The Government does not identify any evidence in the record that indicates Kristy Le was on notice before trial that the Upstream Defendants would use her as a scapegoat. Even if Kristy Le could surmise in advance that her co-defendants might turn on her, she would have nothing to show a "serious risk" that it would prejudice her. *See Zafiro*, 506 U.S. at 539. Thus, we conclude that the basis for her motion was not "reasonably available" before trial, and she was not subject to Rule 12's pre-trial filing requirement.

However, Kristy Le only moved for severance on the grounds that her co-defendants' defenses were mutually antagonistic to her defense. She never raised the argument that the evidence they admitted varied from the allegations charged in the indictment or that her Confrontation Clause rights were violated. Failure to make an alternative argument in support of a motion

---

determine whether she preserved error in order to determine whether the plain error standard of review applies. *See United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir. 1992) (en banc) ("If neither party suggests the appropriate standard, the reviewing court must determine the proper standard on its own.").

forfeits the issue and subjects it to plain error review. *See United States v. Mix*, 791 F.3d 603, 611–12 (5th Cir. 2015).[5]

Consequently, we conclude that Kristy Le preserved the argument that the joint trial prejudiced her by subjecting her to her co-defendants' antagonistic defenses. That argument is thus reviewed for abuse of discretion. *See United States v. Rubio*, 321 F.3d 517, 526 (5th Cir. 2003) (citing *United States v. Lee*, 744 F.2d 1124 (5th Cir.1984)). She has forfeited the arguments that failure to sever resulted in a variance and created Confrontation Clause problems. Those arguments are therefore reviewed for plain error. *See United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc).[6]

### 2. Merits of Kristy Le's arguments.

Under the appropriate standard of review, Kristy Le has not identified any prejudice that warrants reversal. We therefore affirm her conviction.

### a.    Antagonistic defenses.

Kristy Le argues that failing to sever her case prejudiced her because she was subject to her co-defendants' "antagonistic defenses." The Supreme Court addressed the concept of "antagonistic defenses" in *Zafiro v. United States*, 506 U.S. 534 (1993). There the Supreme Court refused to adopt a

---

[5] For pre-trial motions, like a motion to suppress, this court has previously held that unasserted arguments are waived, rather than merely forfeited. *See United States v. Pope*, 467 F.3d 912, 918–19 (5th Cir. 2006); *see also United States v. Scroggins*, 599 F.3d 433, 448 (5th Cir. 2010) (acknowledging waiver but also asserting discretionary authority to review for plain error). These decisions pre-date the 2014 amendments which eliminated the word "waiver," and thus do not assist our analysis of the current rule.

[6] "The Supreme Court has identified four requirements for reversing a trial court based upon plain error review: (1) 'there must be an error or defect—some sort of [d]eviation from a legal rule—that has not been intentionally relinquished or abandoned'; (2) 'the legal error must be clear or obvious, rather than subject to reasonable dispute'; (3) 'the error must have affected the appellant's substantial rights'; and (4) 'if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (alterations in the original) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

No. 16-60843

"bright-line rule" that antagonistic defenses would automatically entitle a defendant to severance. *Id.* Instead, district courts were directed to sever "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. "[Federal Rule of Criminal Procedure] 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at 538–39.

Since *Zafiro*, this court has consistently affirmed district courts' decisions to remedy any potential prejudice with "instructions to consider the evidence as to each defendant separately and individually, and not to consider comments made by counsel as substantive evidence [as sufficient] to cure any prejudice caused when co-defendants accuse each other of the crime." *United States v. Richards*, 204 F.3d 177, 195 (5th Cir. 2000) (quoting *United States v. Mann*, 161 F.3d 840, 863 (5th Cir. 1998), *overruling on other grounds recognized by United States v. Byrd*, 377 F. App'x 374, 377 (5th Cir. 2010); *see also United States v. Solis*, 299 F.3d 420, 442 (5th Cir. 2002); *United States v. Daniels*, 281 F.3d 168, 177–78 (5th Cir. 2002); *United States v. Matthews*, 178 F.3d 295, 298–99 (5th Cir. 1999); *United States v. Stouffer*, 986 F.2d 916, 924–25 (5th Cir. 1993). The district court gave such instructions here, and Kristy Le fails to explain why they were insufficient to cure any prejudice that occurred.[7] Consequently, we see no reversible error for failing to sever based on the existence of antagonistic defenses.

---

[7] She instead relies on pre-*Zafiro* precedent, arguing that the precedent shows she was subject to mutually antagonistic defenses. *See United States v. Romanello*, 726 F.2d 173, 177 (5th Cir. 1984); *United States v. Johnson*, 478 F.2d 1129, 1134 (5th Cir. 1973). But even assuming those cases survive *Zafiro*, she still has the burden of showing that the limiting instructions were insufficient to cure any prejudice, which she does not do.

### b.     Material variance.

Kristy Le next argues that the joint trial resulted in a material variance because her co-defendants introduced evidence varying from that in the indictment.   "A material variance occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *United States v. Rodriguez*, 553 F.3d 380, 392 (5th Cir. 2008) (quoting *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007)).   "A variance is immaterial if the nature of the charge remains the same." *United States v. Valencia*, 600 F.3d 389, 432 (5th Cir. 2010).  The variance doctrine is meant to protect defendants from undue surprise at trial; they may not be indicted under one factual theory only to have another sprung on them at trial.  *See Rodriguez*, 553 F.3d at 392. It is rooted in the Sixth Amendment right "to be informed of the nature and cause of the accusation" against a defendant.  U.S. Const. amend. VI; *see also Guilbeau v. United States*, 288 F. 731, 732 (5th Cir. 1923).

Kristy Le argues her co-defendants caused a material variance by portraying themselves as victims, rather than co-defendants.  However, even if we assume failure to sever did cause a material variance—and we do not resolve that question—it was not an obvious error to fail to recognize such a variance.   This case would present a novel context of a co-defendant, rather than the Government, causing the material variance; Kristy Le points to no precedential law on this point. Where we would have to extend the law in a novel way in order to rule in a party's favor, the second prong of plain error is not met.  *See United States v. Lucas*, 849 F.3d 638, 645 (5th Cir. 2017) ("An error is not plain under current law if a defendant's theory requires the extension of precedent." (internal quotation marks omitted) (quoting *United States v. Trejo*, 610 F.3d 308, 319 (5th Cir. 2010))).  Consequently, the district court did not plainly err by failing to recognize any potential variance.

### c.     Confrontation Clause.

Kristy Le also argues that failing to sever her case prejudiced her by depriving her of her Sixth Amendment right "to be confronted with the witnesses against" her.  U.S. Const. amend. VI.  Mikal made statements about the facts of the case while representing himself pro se.  We conclude that there was no error, certainly no plain error.

Kristy Le cites no authority from our court about a co-defendant's pro se representation causing Confrontation Clause problems.  Our court previously addressed a similar challenge but concluded that the co-defendant's statements were not sufficiently accusatory to be inculpatory.  *See United States v. Daly*, 756 F.2d 1076, 1080–81 (5th Cir. 1985).  Other courts of appeals have addressed similar cases, each evaluating whether the district court took steps to adequately remedy any potential prejudice.  *See United States v. Sacco*, 563 F.2d 552, 555–57 (2nd Cir. 1977) (seminal case suggesting steps to avoid prejudice but ultimately finding no reversible error); *see also United States v. Brown*, 227 F. App'x 795, 800 (11th Cir. 2007) (checking for remedial steps suggested in *Sacco* and finding no reversible error); *United States v. Knowles*, 66 F.3d 1146, 1160 (11th Cir. 1995) (same); *Person v. Miller*, 854 F.2d 656, 666 (4th Cir. 1988) (same).  None has found reversible error.  Just like her variance argument, Kristy Le's Confrontation Clause argument would require us extending our precedent beyond where it has gone before and is not plain error.  *Lucas*, 849 F.3d at 645.

More importantly, the district court gave instructions to mitigate any problems posed by Mikal's self-representation.  Kristy Le complains about Mikal's comments during closing argument.  Those comments were redundant of evidence presented by witnesses during the trial, and the court warned jurors that statements made during opening statements and closing arguments were not evidence.  The court also warned jurors that Mikal should

No. 16-60843

not "get any special attention . . . . [T]reat Mr. Watts just like you treat any other litigant or defendant in this case." Finally, as part of its general instructions, the court instructed jurors that "[t]he questions, statements, objections, and arguments made by the lawyers are not evidence." Kristy Le has not identified any prejudice that was not adequately remediated by the court's instructions. Thus, we conclude that there was no plain error.

**B. Denial of Warren's request to inspect grand jury materials.**

Warren also argues his conviction should be vacated because the district court denied him inspection of grand jury materials.[8] Warren wanted to inspect the documents to determine whether the Government had presented statements he made as part of a proffer agreement to the grand jury, which Warren asserts would have violated the agreement. However, Warren's proffer agreement with the Government prohibits the Government from using his statements "in any criminal case during the government's case in chief." Warren argues that phrase extends to grand jury proceedings and, if the Government used his statements before the grand jury, it violated the proffer agreement. The Government contends the phrase "case in chief" narrows the prohibition to use at trial, rather than before a grand jury.

---

[8] Separately, Warren also argues that the district court erred at trial because it permitted a witness to testify that Warren and Kristy Le were seen making out at a casino. He argues that the district court should not have admitted this evidence because it violates Federal Rules of Evidence 403 and 404(b). Because this argument is meritless, we address it only briefly. Even properly preserved Rule 403 objections are reviewed "with an especially high level of deference to the district court, with reversal called for only rarely and only when there has been a clear abuse of discretion." *United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015) (quoting *United States v. Dillon*, 532 F.3d 379, 387 (5th Cir. 2008)). The relationships—and consequent motives—of individuals in an alleged conspiracy is critical evidence. The district court's decision was likely right in the first instance, and its ruling cannot be disturbed in light of the standard of review. Rule 404(b) explicitly permits evidence to be used to prove "motive, . . . intent [and] knowledge." Thus, even under the "heightened" abuse of discretion review that applies specifically to Rule 404(b) motions, Warren fails to show any error. *See United States v. Gutierrez-Mendez*, 752 F.3d 418, 423 (5th Cir. 2014) (setting forth standards for preserved Rule 404 objections).

13

As the district court concluded, the term case-in-chief is uniquely linked with trials, not any preliminary proceedings. *See In re Grand Jury Subpoena to Janan*, 325 F. App'x 551, 552 (9th Cir. 2009) (mem. op.) ("We reject Janan's suggestion that the term 'case-in-chief' encompasses preliminary proceedings in any action. No trial has yet taken place, and therefore no case-in-chief has yet been presented." (footnote omitted)); *Case-in-chief*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "case-in-chief" to mean "[t]he evidence presented at trial by a party between the time the party calls the first witness and the time the party rests" or "[t]he part of a trial in which a party presents evidence to support the claim or defense"). The district court did not err by denying Warren inspection of the grand jury materials.

**C. Loss calculation.**

Warren contends that the district court erred in calculating his intended loss at "not less than $550 million." Where the error is preserved, we review "the district court's interpretation or application of the Guidelines de novo, and its factual findings for clear error." *United States v. Reyna-Esparza*, 777 F.3d 291, 293–94 (5th Cir. 2015). The methodology used to determine loss calculations is reviewed de novo; clear error applies to "background findings of fact that determine whether or not a particular method is appropriate, as well as to the mathematical calculations and the appraisals of value that are made using the method chosen." *United States v. Harris*, 597 F.3d 242, 251 n.9 (5th Cir. 2010).

The district court reviewed the PSR's determination of the intended loss amount. The PSR originally calculated the intended loss at $2,010,538,000—the total value of the claims Mikal's firm represented in the BP settlement. After Warren objected to the loss calculation, the probation officer responsible for the PSR modified and explained the calculation in an addendum. The probation officer began with the total value of Mikal's supposed clients' claims.

Then, the probation officer attempted to adjust the approximately $2 billion to account for any actual clients that Mikal's firm represented.  To determine the adjustment, he looked at the number of alleged clients the Government contacted (523) in comparison to how many reported they were actually represented by Mikal's firm (15), which is about 3%; the officer noted that in contacting clients, the Government "chose to focus on the 1,241 clients that identified Mississippi as their state of residence."  Then, he reasoned, "If this percentage of actual clients calculated from this subset of contacted clients along the Mississippi Gulf Coast, which is nearly 3%, was extrapolated to the entire number of purported clients, Mikal Watts only had 1,320 actual clients and 42,684 of the names were fraudulent."  The probation officer assumed, for Warren's benefit, that each of the actual clients claimed the maximum amount possible ($83,590), then deducted the total value of "real claims" from the original figure, resulting in an intended loss of $1,900,199,200.  The district court in reviewing this material concluded that evidence supported a conclusion that the intended loss was "at least" $550 million, a number which would support the enhancement at issue.

Warren argues that the district court did not properly analyze his actual intent.  It is true that the district court could have provided a more detailed analysis of its reasoning, but the court's explanation is adequate.  Warren was convicted of a conspiracy.  The heart of the conspiracy was creating false claims to obtain money from BP.  Warren, whom the jury found to be participating in the obtaining of massive numbers of fraudulent names and identifications, thus knew that such false information would be filed with the court in an effort to obtain money, since that was the point of the whole scheme.  As such, we conclude that the district court did not err in calculating the loss amount attributable to Warren.

AFFIRMED.