# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-41347

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JOSE GUADALUPE REYNA-ESPARZA,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

January 29, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

After pleading guilty, Defendant-Appellant Jose Guadalupe Reyna-Esparza challenges the application of a four-level sentencing enhancement for brandishing a weapon during an alien harboring offense. We affirm.

## I. Factual and Procedural Background

On June 4, 2013, two aliens who were unlawfully present in the United States reported to a Border Patrol agent that they had been harbored at a stash house in McAllen, Texas. The aliens identified Reyna-Esparza as one of the caretakers of the stash house and reported that he was armed with a pistol. On June 17, 2013, agents began surveillance of the stash house and observed

No. 13-41347

the arrival of a pickup truck driven by Reyna-Esparza. Later that day, agents observed Reyna-Esparza leaving the stash house in a minivan and requested the assistance of local law enforcement to conduct a traffic stop. Reyna-Esparza fled from the police, but was eventually apprehended along with two female aliens from the stash house. After his arrest, Reyna-Esparza waived his *Miranda* rights and gave a statement. He admitted that he was a citizen of Mexico, that he was unlawfully present in the United States, and that he had lived in McAllen for a year. He had paid $1,000 to be smuggled into the United States. While he was being harbored in the United States, a smuggler named Jesus Olguin recruited him to transport unlawful aliens to the stash house and feed them in exchange for $450 per week. Reyna-Esparza said that he had transported and fed aliens for this alien smuggling organization for approximately one month. Reyna-Esparza stated that earlier that same day, approximately fifty aliens at the stash house were loaded into a U-Haul rental truck and dropped off at an area south of the Border Patrol checkpoint. Olguin used four brush guides to help the aliens avoid the checkpoint.

According to the presentence report ("PSR"), some of the aliens who had been at the stash house described Reyna-Esparza's actions at the house to various law enforcement and immigration officials. They reported that Reyna-Esparza wrote the names of newly-arrived aliens in a ledger and conducted head counts at the stash house "to ensure that no one had escaped." He instructed the aliens not to talk loudly, make loud noises, look out the windows, or go outside. Reyna-Esparza confiscated the aliens' cell phones, and at one point grabbed a juvenile alien by the shirt and scolded him for having called a family member. One minor female alien reported that on multiple occasions, Reyna-Esparza took her to a local hotel and had sex with her, although she told him she did not want to have sex with him. On July 16, 2013, four female aliens escaped from the stash house by leaving through a window. The aliens

No. 13-41347

left because of the poor conditions at the house, including heat, overcrowding, and too little food. When Reyna-Esparza met those aliens walking on the road, they reported that he was "furious" and repeatedly "demanded" they get in the vehicle and return to the stash house. He attempted to block their path with his vehicle. They repeatedly refused to return and he eventually drove away and, by his own admission, notified Olguin about the escape. The four aliens turned themselves in to local authorities.

Two witnesses provided information about the weapon Reyna-Esparza carried in the stash house. Sandra Giron and Haydee Herrera, two of the aliens who escaped from the stash house, witnessed Reyna-Esparza instruct another alien to retrieve a handgun from the minivan. The alien brought the handgun, wrapped in a towel or shirt, into the stash house and gave it to Reyna-Esparza, who then placed it in his waistband. According to the PSR, Giron told immigration officials that Reyna-Esparza "brandished a handgun that he carried in his waistband to let everyone know that he was in charge of the targeted stash house." Reyna-Esparza admitted possessing a weapon while he was at the stash house, although he stated it was a pellet gun.

Reyna-Esparza pleaded guilty to one count of conspiring to harbor an alien, 8 U.S.C. § 1324, in exchange for the dismissal of four additional counts. The PSR recommended, *inter alia*, application of a four-level enhancement for brandishing a weapon, pursuant to U.S.S.G. § 2L1.1(b)(5)(B). At sentencing, the district court overruled Reyna-Esparza's objection to the brandishing enhancement. Reyna-Esparza received multiple additional enhancements that he does not challenge on appeal. His final Guidelines range was 87 to 108 months. The district court sentenced him to 108 months in prison, followed by a two-year term of supervised release. Reyna-Esparza filed a timely notice of appeal, challenging the application of the brandishing enhancement.

No. 13-41347

## II. Discussion

U.S.S.G § 2L1.1(b)(5)(B) provides that if a dangerous weapon "was brandished or otherwise used" during an offense, the base offense level should be increased by four levels. The applicable Guidelines commentary defines "brandishing" as follows:

> "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

U.S.S.G. § 1B1.1, cmt. n.1(C); *United States v. Fuentes-Jaimes*, 301 F. App'x 379, 382 (5th Cir. 2008). "The guidelines' commentary is given controlling weight if it is not plainly erroneous or inconsistent with the guidelines." *United States v. Urias-Escobar*, 281 F.3d 165, 167 (5th Cir. 2002). The Guidelines commentary also expressly provides that a pellet gun is considered to be a dangerous weapon, although it is not classified as a firearm. U.S.S.G. § 1B1.1 cmt. n.1(G).

We review the district court's interpretation or application of the Guidelines de novo, and its factual findings for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). To the extent that Reyna-Esparza argues that the district court misapplied the Guidelines because it misunderstood the applicable legal standard, we review that issue de novo. To the extent that Reyna-Esparza challenges the sufficiency of the evidence supporting the finding that he displayed a weapon with the required intent to intimidate, we review that factual finding for clear error. *See United States v. Mendoza-Rojas*, 343 F. App'x 967, 968 (5th Cir. 2009) (stating that whether the defendant displayed a weapon with intent to intimidate is a factual issue); *Fuentes-Jaimes*, 301 F. App'x at 382 (stating that whether a

defendant brandished a weapon is a factual issue). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Cisneros-Gutierrez*, 517 F.3d at 764 (citation omitted). The government must prove the facts necessary to support a sentencing enhancement by a preponderance of the evidence. *See United States v. Conner*, 537 F.3d 480, 491-92 (5th Cir. 2008).

Reyna-Esparza first argues that the district court applied an erroneous definition of brandishing because it did not require proof of intent to intimidate. Based on the entirety of the district court's discussion of the brandishing enhancement, it is clear that the district court understood and correctly applied the definition of brandishing. Specifically, the court stated:

> [Brandishing] means that all or part of the weapon was displayed or the presence of the weapon was otherwise made known to another person in order to intimidate, regardless of whether it was actually visible to that person. And the fact that he had somebody go out to the vehicle to get it and bring it into the house. I mean, what other reason would you have to – if – if – let's say people say they have this, you know, for their own personal protection or they have it for – for hunting. But if it's in the vehicle, why in the world does he need to get it into the house other than to let people know in the house that he has the weapon. Especially in light of the circumstances here as it relates to the other aliens that attempted to escape, to let it be known to them that – that he actually is in possession of a weapon. And that it's being used to hold them in line, so to speak.

Subsequently, in response to defense counsel's argument that "I think of brandishing – I think of displaying it in a way that its intimidating or threatening to people, which would be a step below actual use of it," the court went on to say: "Well, and that – and that is. It doesn't have to be in order to intimidate. But that's what I'm saying. I'm making that finding here based on the circumstances." Reyna-Esparza argues that this exchange shows that the district court concluded that an intent to intimidate was unnecessary. We

disagree. In the context of the court's entire discussion, including its initial correct statement of the applicable legal standard and its discussion of Reyna-Esparza's reasons for having the gun brought to him inside the house, it is clear that the district court understood that an intent to intimidate was required and did make a factual finding that Reyna-Esparza displayed a weapon with intent to intimidate.

Reyna-Esparza next contends that the facts surrounding his conduct with regard to the weapon do not support a finding that he had the required intent to intimidate. While it is true that there is no evidence Reyna-Esparza made any direct threat to the aliens regarding the pellet gun, we have recognized in other contexts that "it is commonly understood that a person may intimidate another without actually making a direct or even veiled threat." *United States v. Hicks*, 980 F.2d 963, 973 (5th Cir. 1992). In previous cases, we have upheld application of this brandishing enhancement when the totality of the circumstances surrounding the alien harboring offense reasonably supported the finding that a defendant's display of a weapon was in order to intimidate others.

In *Fuentes-Jaimes*, we upheld application of the brandishing enhancement where the defendant displayed a pistol in front of smuggled aliens before departing for a buyout, and where his co-defendant carried the gun in his waistband prior to the exchange of money, when the smuggled aliens knew they were not free to leave until the money had been exchanged. *Fuentes-Jaimes*, 301 F. App'x at 383. In *Mendoza-Rojas*, we upheld application of the enhancement when the defendant displayed a weapon during and after a kidnapping of smuggled aliens. *Mendoza-Rojas*, 343 F. App'x at 969. In *United States v. Alcala*, on plain error review, we affirmed application of the enhancement in circumstances very similar to the instant case, and specifically noted as supporting facts that "It was reasonable to infer that the unlawful

aliens being harbored by Alcala could not leave at will from the residence where they were housed, and several of these aliens reported seeing Alcala holding a handgun inside the residence." 341 F. App'x 985, 986 (5th Cir. 2009).

Reyna-Esparza attempts to distinguish these unpublished cases on the basis that the smuggled aliens in those cases were held against their will, whereas he contends that the aliens at the stash house in the instant case were free to leave at any time.  However, there is evidence in the record supporting a conclusion that the aliens were in fact not free to leave.  Multiple aliens described various actions taken by Reyna-Esparza at the stash house to prevent the aliens from leaving.  Reyna recorded their names in a ledger, conducted regular head counts of the aliens "to ensure that no one had escaped," instructed aliens not to go outside, confiscated cell phones, and scolded a juvenile who called a family member.  On multiple occasions, Reyna-Esparza sexually assaulted a minor female alien from the stash house at a local hotel.  After four aliens escaped from the stash house through a window, Reyna-Esparza became "furious" when he saw them walking down the road and then blocked their path and repeatedly ordered them to return to the stash house.  One of the aliens who escaped stated that she and the other escapees feared returning to the stash house because they believed Reyna-Esparza would punish them.

In these circumstances, we find no clear error in the district court's finding that Reyna-Esparza displayed the weapon with intent to intimidate. Multiple aliens reported that Reyna-Esparza displayed a weapon in his waistband in the stash house. Two aliens witnessed him instruct another alien to bring him the weapon from his vehicle, and then place it in his waistband in the stash house.  One of these aliens asserted that Reyna-Esparza used the weapon to make sure everyone was aware that he was in charge.  Given the totality of the circumstances surrounding the alien harboring offense, it was

reasonable for the district court to infer that there was no other reason why Reyna-Esparza would have the pellet gun brought to him inside the house or why he would carry it in his waistband in the house other than to make it known to the aliens that he had a weapon and to assert his authority over the aliens at the stash house.

In light of the record as a whole, the district court's finding that Reyna-Esparza displayed the weapon with intent to intimidate is plausible, and thus we find no clear factual error. *See Cisneros-Gutierrez*, 517 F.3d at 764. The district court did not err in applying the § 2L1.1(b)(5)(B) sentencing enhancement for brandishing a dangerous weapon.

### III. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.