# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10385

United States Court of Appeals
Fif h Circuit

**FILED**
February 24, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

BARRY BAYS; JERAD COLEMAN,

> Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:13-CR-357-1

Before DAVIS, DENNIS, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

The defendants Barry Bays and Jerad Coleman were indicted for conspiracy to distribute a controlled substance analogue, conspiracy to defraud the United States, and conspiracy to commit mail fraud. Bays was also indicted for possession of a firearm in furtherance of a drug trafficking crime and use of a communication facility to facilitate a drug felony. A jury found the defendants guilty on all counts and the defendants appealed. We

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-10385

REVERSE the conviction for conspiracy to distribute a controlled substance analogue as to both defendants. We also REVERSE Bays's conviction for possession of a firearm and use of a communication facility. We AFFIRM all other counts. The case is REMANDED for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Barry Bays founded and owned Little Arm, Inc., doing business as B&B Distribution ("B&B"). Jerad Coleman, Bays's brother, worked as an employee of B&B. The company produced and sold "spice," a type of synthetic marijuana made by spraying or mixing certain synthetic chemicals into plant products. B&B distributed its product to customers in over 30 states across the country, selling it through gas stations, tobacco shops, and other retailers.

B&B sold spice as potpourri or air freshener, labeling it "[n]ot for human consumption" or "[f]or novelty purposes only." Nevertheless, there was substantial evidence that the product was intended to be smoked. For example, B&B promoted smoking the product by hiring someone to smoke and review the product on YouTube, commissioning a rap group to sing about it, and engaging in other marketing efforts.

Bays maintains that B&B was run as a legitimate business. Because of the constantly changing market for the chemicals used in making spice, Bays points out that the legality of the chemicals is sometimes unclear. When a chemical is discovered, the Drug Enforcement Administration ("DEA") often initiates the process to "schedule" it under the Controlled Substances Act, but in the intervening time other chemicals enter the market. Some of the not-yet-scheduled chemicals are criminalized under the Controlled Substances Analogue Enforcement Act of 1986 ("Analogue Act"), which operates to treat substances that are "substantially similar" to a scheduled substance the same as a scheduled substance under federal law. *See* 21 U.S.C. §§ 802(32)(A), 813.

2

No. 15-10385

Much of this case centers on the Analogue Act because, as the Government points out, spice producers often "tried to stay one step ahead of authorities' efforts to outlaw synthetic cannabinoid chemicals as they were discovered."

In an effort to maintain legitimacy and reassure customers, Bays contracted with an independent lab to test B&B's product and create "Does Not Contain Reports." These reports would indicate whether any federal or state scheduled drug was detected. The reports did not, however, indicate whether the product contained an analogue to a scheduled drug. B&B often included these reports and letters of affirmation in shipments to customers.

In November 2012, Indiana police conducted a controlled buy of B&B's product at a gas station and determined that it contained the substance XLR-11, which was a scheduled substance in Indiana as of September 14, 2012.[1] Indiana police then executed a search warrant at Bays's residence and production facility on December 20, 2012. The Indiana police confiscated spice product, but determined the chemicals in the product were not illegal under Indiana law at that time. They also found a pipe that later tested positive for XLR-11. Finally, they confiscated two handguns, one located near where Bays was seated when police entered the residence, and the other located in his makeshift garage office. The State did not prosecute Bays. B&B resumed operation about a week after the search. In May 2013, B&B moved its production facility from Indiana to Ohio in response to proposed Indiana legislation concerning spice manufacturing.

In August 2013, the DEA executed a warrant to search Bays's residence in Indiana and B&B's facility in Ohio. As a result of that search, Bays, Coleman, and several others involved with B&B were indicted. Many of the

---

[1] XLR-11 was scheduled as a controlled substance under federal law on May 16, 2013.

3

No. 15-10385

defendants entered plea agreements, but Bays and Coleman proceeded to a jury trial.  Bays and Coleman are the only defendants involved in this appeal.

The indictment charged Bays and Coleman with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 ("Count One"), conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349 ("Count Two"), and conspiracy to distribute a controlled substance analogue in violation of 21 U.S.C. § 846 ("Count Three").  The indictment also charged Bays with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) ("Count Four"), and using a communication facility to facilitate a drug felony in violation of 21 U.S.C. § 843(b) ("Count Five").

A jury found Bays and Coleman guilty on all counts, and the district court entered judgment in April 2015.  The defendants appealed.

## DISCUSSION

Bays and Coleman challenge each count under which they were convicted.  We will consider each argument, but we begin with the conspiracy to distribute a controlled substance analogue because it affects our disposition of other counts involved in this appeal.

## I.     *Conspiracy to Distribute a Controlled Substance Analogue*

The Controlled Substances Act "makes it unlawful knowingly to manufacture, distribute, or possess with intent to distribute controlled substances." *McFadden v. United States*, 135 S. Ct. 2298, 2302 (2015) (citing 21 U.S.C. § 841(a)(1)).  The Analogue Act "identifies a category of substances substantially similar to those listed on the federal controlled substance schedules . . . and then instructs courts to treat those analogues, if intended for human consumption, as controlled substances listed on schedule I for purposes of federal law . . . ."  *Id.* (citing 21 U.S.C. §§ 802(32)(A), 813).  A

4

No. 15-10385

"controlled substance analogue" for purposes of the Analogue Act is a substance:

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).

The district court instructed the jury that to find Bays and Coleman guilty for conspiracy to manufacture or distribute a controlled substance analogue, it must be convinced the Government proved beyond a reasonable doubt:

> First: That two or more persons, directly or indirectly, reached an agreement to manufacture or distribute a particular substance(s);
>
> Second: That defendants knew what the substance(s) was . . . ;
>
> Third: That [the substance(s)] was a controlled substance analogue;
>
> Fourth: That defendants knew that the substance(s) was intended for human consumption;
>
> Fifth: That defendants knew of the unlawful purpose of the agreement;

5

No. 15-10385

> Sixth: That defendants joined in the agreement willfully, that is,
> with the intent to further its unlawful purpose.

Bays argued to the district court that the Government must also prove that Bays knew the substances were analogues controlled under federal law. The court rejected Bays's argument. The jury found Bays and Coleman guilty.

After the district court entered judgment, the Supreme Court decided *McFadden*. There, the Court held that the Government must prove "a defendant knew that the substance with which he was dealing was 'a controlled substance,' even in prosecutions involving an analogue." *McFadden*, 135 S. Ct. at 2305. This "knowledge requirement can be established in two ways." *Id.* First, it can be established by proving the defendant "knew that the substance with which he was dealing is some controlled substance — that is, one actually listed on the federal drug schedules or treated as such by operation of the Analogue Act — regardless of whether he knew the particular identity of the substance." *Id.* Second, it can be established by proving the defendant "knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue." *Id.* In other words, if the defendant "knew that [the substance] was substantially similar to [a controlled substance] in its chemical structure and produced a substantially similar 'high,' he had the requisite knowledge that [the substance] was a [controlled substance analogue]." *United States v. Stanford*, 823 F.3d 814, 835 (5th Cir. 2016); *see also* 21 U.S.C. § 802(32)(A).

As the Government acknowledges, in light of *McFadden*, the jury was not properly instructed on the element of knowledge. That was error. Nevertheless, we review to determine whether the error was harmless. *See McFadden*, 135 S. Ct. at 2307 (citing *Neder v. United States*, 527 U.S. 1, 15 (1999)). We confine our inquiry to Bays because the Government explicitly declines to argue that the error was harmless as to Coleman.

6

No. 15-10385

For error to be harmless, we must "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *See Stanford*, 823 F.3d at 828 (quotation marks omitted). We do not take the place of "a second jury to determine whether the defendant is guilty," but rather ask "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *See Neder*, 527 U.S. at 19 (quotation marks omitted).

Our recent decision in *Stanford* is helpful. The defendant in that case, a lawyer, was involved with a group selling and purchasing synthetic marijuana. *Stanford*, 823 F.3d at 823. The defendant performed various roles in furtherance of the group's effort to promote their synthetic marijuana product, and one of the distributors ensured that the defendant was told "everything about the business." *Id.* (quotation marks omitted). Eventually the defendant was indicted for, among other things, conspiracy to distribute and to possess with intent to distribute a schedule I controlled substance in violation of the Controlled Substances Act and the Analogue Act. *Id.* at 826. The district court provided jury instructions very similar to those entered in the current case, and the jury found the defendant guilty on that count. *See id.* at 827.

Like Bays, the defendant in *Stanford* argued that the jury instructions were insufficient because the Government must prove that he knew the substance at issue was a controlled substance analogue. *See id.* at 826. The district court rejected that theory, but it submitted a special interrogatory to the jury asking: "During the [relevant] time period . . . do you find that the defendant . . . knew that [the substance] was a controlled substance analogue?" *Id.* at 828. The jury answered unanimously, "yes." *Id.* at 827.

After the district court entered judgment, the Supreme Court decided *McFadden*. On appeal in *Stanford*, we held the error in instructing the jury was not harmless even though the jury decided that the defendant knew the

7

substance at issue was in fact a controlled substance analogue. *See Stanford*, 823 F.3d at 833–34. We reasoned that the special interrogatory did not render the jury instruction error harmless because the court did not instruct the jury on the burden of proof for the special interrogatory. *Id.* Moreover, "the jury was not aware of the Supreme Court's test for proof of knowledge," so the missing knowledge element was not inherent in the jury's answer to the interrogatory. *Id.* at 835. We noted the Government's argument that there was "ample proof" of the defendant's knowledge that the substance was a controlled substance analogue, but we declined to allow the Government "to look back now that the Court has provided the proper framework and pick out evidence that fits into that framework[.]" *Id.*

By way of comparison, the Fourth Circuit held that the jury instruction error was harmless when it considered *McFadden* on remand from the Supreme Court. *See United States v. McFadden*, 823 F.3d 217, 228 (4th Cir. 2016). The court first concluded "the evidence was sufficient to permit, but not so overwhelming to compel, the jury to find that [the defendant] knew that federal law regulated the [substances] as controlled substances." *Id.* at 226. On *McFadden*'s second method of proof, "recorded telephone conversations overwhelmingly establish[ed] that [the defendant] knew the [substances'] chemical structures and physiological effects." *Id.* These recorded conversations made the error harmless. *Id.* at 228.

As to Bays, the Government argues the proof of his knowledge that he was handling analogues was overwhelming. There are three exchanges that allegedly demonstrate this point.

First, a B&B supplier testified that he warned Bays that a chemical Bays was using — AM-2201 — was an analogue of JWH-018, a controlled substance under federal law. As Bays points out, though, the supplier based his conclusion that AM-2201 was an analogue on his own research. Bays claims

No. 15-10385

that he believed the supplier to be wrong and that the supplier was in fact wrong. Moreover, the supplier also testified that his purpose in relating this information to Bays was to try to convince Bays to start purchasing the supplier's new line of "organics" products. In other words, he had an ulterior motive to convince Bays that AM-2201 was an analogue.

The Government also relies on a text message that Bays's sales supervisor, Kyle Boyer, sent at Bays's direction on May 16, 2013. The Government claims Boyer's message reveals Bays's knowledge that two different chemicals — PB-22 and 5f-PB-22 — were analogues of JWH-018. The text message stated that a ban on the substances would possibly be published that night. It also stated that PB-22 and 5f-PB-22 were analogues of JWH-018, and it discussed the chemical structure. In response, Bays points out that the text message also stated it could not verify whether the substances would be banned. He also notes that the text message claimed the "physiological and toxicological properties of this compound are not known."

Finally, the Government claims Bays knew by September 2012 that yet another chemical — 5f-UR-144 (also known as XLR-11) — was an analogue. That chemical was scheduled as a controlled substance in Indiana on September 14, 2012, and scheduled as a federal controlled substance on May 16, 2013. On September 12, 2012, Bays entered into a text exchange with one of his suppliers in which he reported having received a shipment of "5f-UR" instead of another chemical. Bays stated he could not use the chemical as it is "illegal here, considered an analogue." The Government states the chemical was nonetheless found in Bays's products a few months later, and in his production facility in August 2013. Bays argues this evidence is insufficient because, even if it arguably supports knowledge, it only relates to knowledge of the chemical's status as an analogue under state law. He argues the

9

No. 15-10385

Government "impermissibly conflated state and federal law" when it discussed this text message. [2]

Our task in considering this evidence is not to determine whether it could support a jury's finding that Bays possessed the requisite knowledge beyond a reasonable doubt. Rather, we must be able to say that the evidence could not "rationally lead to a contrary finding with respect to the omitted element." *See Neder*, 527 U.S. at 19. In this case, the focus at trial was proving that Bays understood the substances with which he was dealing, and that the substances were in fact analogues, but not that Bays knew the substances were analogues. In its closing argument, the Government emphatically rejected Bays's suggestion that the Government must prove Bays knew the substances were analogues: "That's 100 percent untrue, and that's not the law, it's never been the law, and that's not what we have to prove." In light of the intervening decision in *McFadden*, the error in instructing the jury was not harmless beyond a reasonable doubt. We reverse.

Bays's conviction for conspiracy to distribute a controlled substance analogue (Count Three) served as the predicate drug offense for two other counts: possession of a firearm in furtherance of a drug trafficking crime (Count Four) and using a communication facility to facilitate a drug felony (Count Five). As the Government acknowledged at oral argument, Counts Four and Five must also fall if we reverse on Count Three. We have; they do.

---

[2] At oral argument, the Government urged us to conclude that because of the similarity between Indiana and federal law in this area, Bays necessarily possessed the requisite knowledge. We decline to make such inferences on harmless-error review when the knowledge element at issue requires the defendant to know that the substance with which he was dealing was controlled under federal law. *See McFadden*, 135 S. Ct. at 2305–06.

10

No. 15-10385

*II.     Conspiracy to Defraud the United States*

Bays and Coleman also challenge their conviction under Count One of the indictment, conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  The defendants moved for acquittal in the district court but did not renew their motion at the end of trial.  We therefore review for a manifest miscarriage of justice.  *See United States v. Dowl*, 619 F.3d 494, 500 (5th Cir. 2010).  We will reverse "only if the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense that is so tenuous that a conviction would be shocking."  *See id.* (quotation marks omitted).  In making this determination, "we consider the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices."  *See United States v. Brown*, 727 F.3d 329, 335 (5th Cir. 2013) (quotation marks omitted).

Count One charged the defendants with conspiring to defraud the United States Food and Drug Administration ("FDA") by impeding its function of regulating drug labeling and approving new drugs, and with conspiring "to commit certain offenses against the United States, that is to violate 21 U.S.C. §§ 331 and 333(a)(2) by introducing or delivering an adulterated or misbranded drug into interstate commerce with the intent to defraud or mislead."[3]  The Government submits the evidence "overwhelmingly demonstrated" that Bays and Coleman agreed to introduce their product into interstate commerce "intending that people consume it but with deceptive and incomplete labeling."

Bays argues that any alleged mislabeling of the spice product was cured by B&B's advertising efforts, and therefore "the evidence is not sufficient to support the jury's verdict that Bays conspired to introduce misbranded drugs

---

[3] The defendants did not raise a duplicity issue prior to trial, nor do they argue duplicity on appeal.

11

into interstate commerce with intent to defraud or mislead." For example, although the spice was labeled "not for human consumption," Bays explains that purchasers could learn that it was intended for human consumption through his "YouTube Infomercials," rap video, and other promotional endeavors. Bays does not explain how the separate, often contradictory advertising saves the product itself from being mislabeled or materially false.

Coleman presents a different argument. He argues that the evidence is not sufficient to support finding that he possessed the requisite intent to defraud or mislead the FDA. At oral argument, the Government explained that this case was not indicted exclusively as a fraud on the FDA, nor was it tried exclusively as a fraud on the FDA. Regardless, the evidence is sufficient to rebut Coleman's argument. Coleman's extensive involvement with the product labeling supports finding he knowingly participated in the conspiracy. *See United States v. Morris*, 46 F.3d 410, 415–16 (5th Cir. 1995). The evidence indicates he filled bags with spice product, affixed labels, and participated in distribution knowing the labels were false. It supports finding that the participants were aware of the FDA and its role in approving drugs, and that they took steps to avoid scrutiny of their product. It further supports finding they intended their product for human consumption yet intentionally decided not to label their product accordingly. There is no manifest miscarriage of justice resulting from this count.

## III.    *Conspiracy to Commit Mail Fraud*

Finally, the defendants submit the evidence was insufficient to support a conviction under Count Two, conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349. Here, too, the defendants did not preserve their challenge because they failed to renew their motion for acquittal at the close of all

12

evidence.  We again review for manifest miscarriage of justice.  *See Dowl*, 619 F.3d at 500.

Count Two charged the defendants with devising a "scheme and artifice to defraud customers of B&B Distribution, and ultimately the general public, by marketing and distributing misbranded drugs to obtain money by means of materially false and fraudulent pretenses and representations . . . ."  Bays and Coleman argue the evidence was insufficient to demonstrate that customers and consumers were actually defrauded or detrimentally relied on representations made on the product packaging.  As Coleman explains, no one was defrauded because all of the customers and consumers were "in on the joke, so to speak . . . ."

Contrary to the defendants' argument, record evidence supports finding that some customers relied on false representations that B&B product was "not intended for human consumption" or was "D.E.A. and state compliant." Regardless, the Government need not demonstrate actual reliance on the alleged misrepresentations.  *See Neder*, 527 U.S. at 24–25.  Rather, it need demonstrate a materially false statement, which requires showing that the statement "has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed."  *See United States v. Harms*, 442 F.3d 367, 372 (5th Cir. 2006).  The record evidence supports finding the defendants falsely labeled their products "not intended for human consumption" and "D.E.A. and state compliant," and these statements plainly have a natural tendency to influence the decision of purchasers of B&B product.  The conviction on Count Two does not constitute a manifest miscarriage of justice.

No. 15-10385

\* \* \*

We REVERSE Count Three as to both defendants. We REVERSE Counts Four and Five as to Bays. We AFFIRM Counts One and Two, and we REMAND for further proceedings.