# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10920

UNITED STATES OF AMERICA,

       Plaintiff - Appellee

v.

BARRY BAYS; JERAD COLEMAN,

       Defendants - Appellants

United States Court of Appeals
Fifth Circuit

**FILED**

February 27, 2019

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:13-CR-357-1

Before ELROD, HIGGINSON and ENGELHARDT, Circuit Judges.

PER CURIAM:*

Brothers Barry Bays and Jerad Coleman (collectively, "Defendants") appeal the sentences imposed by the District Court for the Northern District of Texas, Dallas Division, on remand with respect to their convictions for conspiring to defraud the United States and conspiring to commit mail fraud. For the reasons set forth herein, we VACATE Defendants' sentences and REMAND for further proceedings consistent with this opinion.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-10920

I.

Bays owned and operated, and Coleman worked for, a synthetic marijuana—or "spice"—manufacturing and distribution company referred to as B&B Distribution ("B&B").  B&B distributed its products to smoke shops and convenience stores across the country.  Though its products were intended to be smoked, B&B falsely labeled them as "incense," "potpourri," "air freshener," or "aroma therapy," and as "not for human consumption."  In an additional effort to skirt the legal system and maintain legitimacy, B&B placed "Letter[s] of Affirmation" in its shipments, attesting to the legality of its products, despite the fact that many of them contained illegal controlled-substance analogues.  In connection with their B&B-related activities, Defendants were charged with and subsequently convicted by a jury of each of the following offenses in the United States District Court for the Northern District of Texas, Dallas Division:  (1) conspiring to defraud the United States in violation of 18 U.S.C. § 371 ("Count 1");[1] (2) conspiring to commit mail fraud in violation of 18 U.S.C. § 1349 by marketing and distributing misbranded drugs ("Count 2"); and (3) conspiring to distribute a controlled-substance analogue in violation of 21 U.S.C. § 846 ("Count 3").  Bays was also charged with and convicted of possessing a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) ("Count 4") and using a communication facility—a telephone—to facilitate a drug felony in violation of 21 U.S.C. § 843(b) ("Count 5").

---

[1] Specifically, in Count 1, Defendants were charged with conspiring to defraud the Food and Drug Administration for purposes of impeding its "functions of drug labeling and approving new drugs, before introduction into interstate commerce" and conspiring to commit offenses against the United States "by introducing or delivering an adulterated or misbranded drug into interstate commerce with the intent to defraud or mislead" in violation of  21 U.S.C. §§ 331 and 333(a)(2).

No. 17-10920

The district court sentenced Bays to a total of 425 months of imprisonment,[2] along with three years of supervised release on each count, to run concurrently.    Coleman was sentenced to 188 total months of imprisonment,[3] as well as three years of supervised release on each count, to run concurrently.  The court also ordered Defendants to forfeit the proceeds from Counts 2 and 3.  Bays and Coleman both appealed their convictions and sentences, challenging, among other things, the sufficiency of the evidence presented.

Due to the Supreme Court's intervening holding in *McFadden v. United States*, 135 S. Ct. 2298 (2015), a panel of this court reversed Defendants' Count-3 convictions, as well as Bays's related Count-4 and Count-5 convictions.  *See United States v. Bays*, 680 F. App'x 303, 309 (5th Cir. 2017).  Specifically, the panel recognized that, under *McFadden*, to obtain a conviction for conspiracy to distribute a controlled-substance analogue, the government must prove that "[the] defendant knew that the substance with which he was dealing was 'a controlled substance'." *Id.* at 307 (quoting *McFadden*, 135 S. Ct. at 2305).  The panel further found that "the focus at trial was proving that Bays understood the substances with which he was dealing, and that the substances were in fact analogues, but not that Bays knew the substances were analogues." *Id.* at 309.  Thus, we held that the district court's failure to properly instruct the jury on the element of knowledge was not harmless error as to Bays—a point which was conceded by the government as to Coleman.  *Id.* at 307, 309.  On the other

---

[2] The total sentence breaks down as:  60 months on Count 1; 240 months on Count 2; 240 months on Count 3; 60 months on Count 4; and 48 months on Count 5.  The prison terms for Counts 1, 2, 3 and 5 were to run consecutively with each other, but only to the extent they produced a total term not exceeding 365 months.  The prison term for Count 4 was to run consecutively to the others.

[3] Coleman's total prison term included 60 months on Count 1, 188 months on Count 2, and 188 months on Count 3, each term to run concurrently.

3

No. 17-10920

hand, we affirmed Defendants' convictions for conspiring to defraud the United States and conspiring to commit mail fraud. *Id*. at 310-11.

At Defendants' resentencing hearing on Counts 1 and 2,[4] the district court adopted the pre-sentence report ("PSR") and PSR addendums prepared for each defendant, with the exception of an offense-level adjustment for Coleman that is not at issue here. The amended PSRs grouped Counts 1 and 2 and applied the 2014 version of United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") § 2B1.1,[5] the guideline for, among other offenses, "Fraud and Deceit,"[6] to generate a base offense level of 7 for both Bays and Coleman. Defendants' offense levels were each increased by 20 points based on a finding that the "loss" resulting from the offense was between $7,000,000 and $20,000,000. *See* U.S.S.G. § 2B1.1(b)(1)(K) (2014). They were further increased by two points based on the conclusion that Bays "relocated . . . [his] fraudulent scheme to another jurisdiction to evade law enforcement" and that Coleman participated in such relocation. *Id*. at § 2B1.1(b)(10)(A). Bays's offense level was increased by two additional points because of his use of "mass-marketing," *i.e.* online video posts, to commit the offenses. *Id*. at §

---

[4] The government moved to dismiss Count 3 as to both Bays and Coleman and Counts 4 and 5 as to Bays instead of retrying them on those counts.

[5] There is no dispute that the 2014 version of the Guidelines applies.

[6] For their original sentencings, Defendants' PSRs used the drug-offense guidelines in U.S.S.G. § 2D1.1 to determine Defendants' offense levels since Count 3—conspiracy to distribute a controlled-substance analogue—was the most serious crime of which Defendants had been convicted. *See* U.S.S.G. §§ 3D1.2, 3D1.3 (2014) (indicating how and when to "group" different crimes for Guidelines calculations). Because Count 2 was the most serious crime of which Defendants were convicted after Count 3 was dismissed, Defendants' probation officer applied the guidelines relevant to Count 2 for resentencing. The sentencing guideline for conspiracy, § 2X1.1, directs that the base offense level for conspiracy is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1 (2014). Thus, the probation officer applied the guideline for "Fraud and Deceit" in § 2B1.1 to obtain Defendants' offense levels. *See* U.S.S.G. § 2B1.1 (2014) (guideline for "Fraud and Deceit").

No. 17-10920

2B1.1(b)(2)(A)(ii). Finally, Bays received a four-level adjustment for his role as a leader or organizer of the criminal activity pursuant to U.S.S.G. § 3B1.1(a); while Coleman received a two-level adjustment under U.S.S.G. § 3C1.1 for obstruction of justice based on his false testimony at trial regarding his awareness of the nature of B&B's business.

Bays's PSR, as amended, reflected an adjusted total offense level of 35 and continued to employ, as had his original PSR, a criminal-history category of III due to a child-molestation conviction in 1994. Noting that the maximum statutory prison terms for Counts 1 and 2 were 5 years[7] and 20 years,[8] respectively, and considering Bays's total offense level and criminal-history category, the PSR addendum indicated that Bays's Guidelines imprisonment range was 210 to 262 months. Coleman was determined to have an adjusted total offense level of 31 and a criminal-history category of I. Accordingly, his Guidlines imprisonment range was determined to be 108 to 135 months.

With respect to Bays, the district court departed upwards and imposed a sentence of 60 months of imprisonment on Count 1 and 240 months of imprisonment on Count 2—the statutory maximum for each—to run consecutively. The court also imposed a three-year term of supervised release on each count to run concurrently and issued a forfeiture order in the amount of $622,050. The court cited as reasons for the upward departure Bays's lack of remorse, his criminal history, the widespread nature of the offenses, the dangerousness of the substances involved, and deterrence.

With respect to Coleman, the district court imposed a sentence of 60 months of imprisonment on Count 1 and 115 months of imprisonment on Count 2, to run concurrently, for an in-guidelines total of 115 months. The court also

---

[7] *See* 18 U.S.C. § 371.
[8] *See* 18 U.S.C. §§ 1341, 1349.

imposed 3 years of supervised release on each count to run concurrently. As reasons for his sentence, the court cited Coleman's lack of criminal history, his moderate role in the offenses, the seriousness of the offenses, Coleman's untruthfulness at trial, and his apparent remorse at resentencing.

Defendants now appeal their "new" sentences on Counts 1 and 2. Bays's primary challenge and Coleman's only challenge is to the district court's application of the 20-point enhancement to Defendants' base offense levels based on a determination under U.S.S.G. § 2B1.1(b)(1) that the "loss" resulting from the mail-fraud offense was between $7,000,000 and $20,000,000. Bays also challenges the two-point enhancement imposed under U.S.S.G. § 2B1.1(b)(10)(A) for relocating "[his] fraudulent scheme to another jurisdiction to evade law[-]enforcement or regulatory officials" and the district court's inclusion of his 1994 child-molestation conviction in his criminal-history computation. As explained below, while we find no reversible error with respect to the challenges asserted solely by Bays, we conclude that the district court erred in imposing the 20-point enhancement to Defendants' base offense levels without first finding that Defendants' offenses resulted in an "actual loss" or that Defendants intended for their offenses to result in a loss.

## II.

Where a defendant preserves a procedural sentencing error, such as a Guidelines calculation,[9] by objecting before the district court, this court reviews the sentencing court's factual findings for clear error and its interpretation or application of the Guidelines de novo. *United States v. Velasco*, 855 F.3d 691, 693 (5th Cir. 2017); *United States v. Gomez–Alvarez*, 781 F.3d 787, 791 (5th Cir. 2015). "[A] factual finding is clearly erroneous only

---

[9] "Failure to calculate the correct Guidelines range constitutes procedural error." *Peugh v. United States*, 569 U.S. 530, 537 (2013).

where, in light of the record, the court is left with the definite and firm conviction that a mistake has been committed." *Velasco*, 855 F.3d at 693 (internal quotation marks and citation omitted). In other words, to be clearly erroneous, a factual finding must be "implausible in light of the record as a whole." *United States v. Muniz*, 803 F.3d 709, 712 (5th Cir. 2015) (internal quotation marks and citation omitted). "Sentencing enhancements must be proven by a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted); *see also United States v. Anderson*, 560 F.3d 275, 283 (5th Cir. 2009) ("In order to apply an enhancement, the district court must find evidence supporting the enhancement to a preponderance of the evidence.") "[I]n determining whether an enhancement applies, a district court is permitted to draw reasonable inferences from the facts[.]" *Muniz*, 803 F.3d at 712 (internal quotation marks and citation omitted). Such inferences are considered factual findings. *Id.*

Unpreserved sentencing objections, on the other hand, are reviewed "only for plain error." *United States v. Martinez-Rodriguez*, 821 F.3d 659, 662 (5th Cir. 2016) (internal quotation marks and citation omitted). This rule "serves a critical function by encouraging informed decisionmaking and giving the district court an opportunity to correct errors before they are taken up on appeal." *United States v. Peltier*, 505 F.3d 389, 392 (5th Cir. 2007). Under plain-error review, an appellant must show that a legal error occurred that was "clear or obvious" and that affected his "substantial rights." *Puckett v. United States*, 556 U.S. 129, 135 (2009). An error is not "clear or obvious" if it is "subject to reasonable dispute." *Id.* A clear or obvious sentencing error can be said to have affected a defendant's "substantial rights" if it "affected the outcome of the district court proceedings." *U.S. v. Mares*, 402 F.3d 511, 521 (5th Cir. 2005) (internal quotation marks and citation omitted). A defendant can meet this standard by "demonstrat[ing] a probability sufficient to

No. 17-10920

undermine confidence in the outcome." *Id.* (internal quotation marks and citation omitted). Once plain error is established, this Court has "discretion to notice [the] forfeited error but only if [it] seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 520 (internal quotation marks and citation omitted).

III.

We first consider the objection posed by both Defendants—that the district court erred in imposing a 20-point enhancement to their base offense levels due to the extent of loss caused by their fraudulent activities. Under U.S.S.G. § 2B1.1, the "Fraud and Deceit" guideline used in Defendants' resentencing, "loss" resulting from covered offenses is considered a "[s]pecific [o]ffense [c]haracteristic[]," which allows for incremental increases in an offender's offense level corresponding to monetary value. U.S.S.G. § 2B1.1(b)(1) (2014). Application note 3 to § 2B1.1 explains how to ascertain and calculate loss.[10] Section A of the application note contains the "General Rule" and provides, in pertinent part, as follows:

> **(A) General Rule.--**Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
> **(i) Actual Loss.--**"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
> **(ii) Intended Loss.--**"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
> **(iii) Pecuniary Harm.--**"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

---

[10] Under our jurisprudence, "[t]he [G]uidelines' commentary is given controlling weight if it is not plainly erroneous or inconsistent with the [G]uidelines." *United States v. Reyna-Esparaza*, 777 F.3d 291, 293 (internal quotation marks and citation omitted).

**(iv) Reasonably Foreseeable Pecuniary Harm.**--For purposes
of this guideline, "reasonably foreseeable pecuniary harm" means
pecuniary harm that the defendant knew or, under the
circumstances, reasonably should have known, was a potential
result of the offense.

*Id*. at § 2B1.1(b)(1) cmt. n.3(A).  Section B of application note 3, titled "Gain,"
advises that if, but "only if," "there is a loss but it reasonably cannot be
determined," then "[t]he court shall use the gain that resulted from the offense
as an alternative measure of loss."  *Id*. at § 2B1.1(b)(1) cmt. n.3(B).

With respect to determining the amount of a loss, Section C of the
application note instructs that "[t]he court need only make a reasonable
estimate."  *Id*. at § 2B1.1(b)(1) cmt n.3(C).  It further recognizes that "[t]he
sentencing judge is in a unique position to assess the evidence and estimate
the loss based upon that evidence" and, therefore, that "the court's loss
determination is entitled to appropriate deference."  *Id*.

Application note 3 also contains "Special Rules" that, "[n]otwithstanding
[the 'General Rule' of] subdivision (A), . . . shall be used to assist in determining
loss in the cases indicated."  *Id*. at § 2B1.1(b)(1) cmt n.3(F).  These include a
special rule titled "Value of Controlled Substances," which states:  "In a case
involving controlled substances, loss is the estimated street value of the
controlled substances."  *Id*. at § 2B1.1(b)(1) cmt. n.3(F)(vi).  It is on this rule
that Defendants' probation officer initially relied to generate a loss figure for
resentencing.  Noting that "[b]usiness records revealed that between January
24, 2013, and April 30, 2013, B&B[] distributed approximately 958,879.50
grams or 958.9 kilograms of synthetic cannabinoids which contained controlled
[-]substance analogues" and that Drug Enforcement Agency ("DEA") agents
had "determined that the street value of the synthetic cannabinoid was $10 per
gram," the probation officer found that the loss resulting from Count 2 was

No. 17-10920

$9,588,795 and, therefore, that a 20-point enhancement was appropriate under U.S.S.G. § 2B1.1(b)(1)(K).[11]

Bays objected to the probation officer's use of application note 3(F)(vi), "Value of Controlled Substances," arguing that it applies only in cases involving controlled substances—not controlled-substance analogues; that a substance cannot be considered a controlled-substance analog unless it has been judicially determined to be so; and that using application note 3(F)(vi) in sentencing him would violate his due-process rights given the *McFadden*-necessitated overruling of his conviction for conspiring to distribute controlled-substance analogues. The probation officer maintained that her loss calculation and analysis were correct[12] but added that, regardless of the categorization of the substances handled by B&B, a 20-point enhancement would be supported under U.S.S.G. § 2B1.1, application note 3(B), "Gain." The gain from the mail-fraud conspiracy, according to the probation officer, was $7,336,248.20—the amount of B&B's sales of synthetic cannabinoid products "with materially false labeling."

At the resentencing hearing, Bays reiterated prior objections and urged that no loss—either actual or intended—resulted from the offense conduct on which to base any enhancement under U.S.S.G. § 2B1.1(b)(1). Specifically, he argued: "[T]here is no actual loss because none of the quote, unquote, victims

---

[11] Under the 2014 version of the Sentencing Guidelines, 20 points are added where the loss resulting from a covered offense is between $7,000,000 and $20,000,000. U.S.S.G. § 2B1.1(b)(1)(K) (2014).

[12] In support, she pointed out that under 21 U.S.C. § 802(32), a "controlled[-] substance analogue is a controlled substance for purposes of . . . [G]uideline[s] applications." She further noted that the guideline dealing with drug offenses, U.S.S.G. § 2D1.1, includes "any analogue of [a . . . ] controlled substance." *See* U.S.S.G. § 2D1.1 cmt. n.6 (2014) ("Any reference to a particular controlled substance in these [G]uidelines includes all salts, isomers, all salts of isomers, and, except as otherwise provided, any analogue of that controlled substance."). Additionally, the probation officer specified that federal agents determined that 958.9 grams of B&B products distributed between January 24, 2013 and April 30, 2013 "contained PB-22 or 5f-PB-22, controlled substance[-]analogues."

of the mail fraud . . . actually lost any money, and there was no intended loss because Mr. Bays wasn't selling the products for these people to lose money[;] he was selling these products so they could turn around and resell them to their customers and make money."  Further, Bays contended that because his customers bought his products prior to seeing the allegedly fraudulent labels that they bore or the "Letter[s] of Affirmation" shipped with them, they could not have relied on those labels or the contents of the letters, and, therefore, there "was no but-for causation for the actual loss."  Coleman, for the most part, adopted Bays's objections.

Ultimately, the district court agreed with the government that *McFadden's* scienter requirement for a controlled-substance-analog offense did not apply to sentencing.  Finding that there was "more than ample evidence to support the position that these were analogues," the court concluded that use of U.S.S.G. § 2B1.1 application note 3(F)(vi), "Value of Controlled Substances," to determine loss resulting from the mail-fraud offense was appropriate.  The court further found that application note (3)(B), "Gain," could also be used and supported at least a $7.3-million loss figure.  Thus, the court concluded that under either method of loss calculation, a 20-point enhancement was justified under U.S.S.G. § 2B1.1(b)(1)(K).

On appeal, Defendants continue to urge similar objections to the 20-point loss enhancement as they did below.  Namely, they contend that the enhancement is improper because the government failed to prove that there was any loss at all.  They also challenge the district court's finding that application note 3(B)(vi), "Value of Controlled Substances," could be used to calculate loss in this case, continuing to urge that none of the substances that they handled was scheduled by the DEA during the time period in question and that this cannot be treated as a controlled-substance-analog case in light of *McFadden.*  Along these lines, Defendants reiterate their position that a

substance is not a controlled-substance analog unless there is a judicial determination that the offender knew that the substance was federally controlled—which did not occur here. Bays further contends that the district court's application of guidelines for a "controlled[-]substance" case constitutes ex post facto punishment in violation of Article I, Section 9 of the U.S. Constitution.

We review the district court's application of U.S.S.G. § 2B1.1(b)(1), including its method of calculating loss under that section, de novo. *See Velasco*, 855 F.3d at 693 (recognizing that a sentencing court's application of the Guidelines is reviewed de novo); *U.S. v. Harris*, 597 F.3d 242, 249, 251 (5th Cir. 2010) (confirming that a district court's method of calculating loss under U.S.S.G. § 2B1.1(b)(1) is an application of the Guidelines).

Per the plain language of U.S.S.G. § 2B1.1 application note 3,[13] before a sentencing court engages in analyzing the proper method of calculating the loss supporting an offense-level enhancement, it must make a threshold determination that an "actual loss" in the form of "reasonably foreseeable pecuniary harm" in fact resulted from the offense; or that the offender intended for "pecuniary harm" to result from the offense. U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A) (2014). Here, while the district judge attempted to be thorough in her consideration of Defendants' sentencing objections—as reflected by the sentencing transcript—and spent a good deal of time addressing objections pertaining to the proper method of calculating loss, she did not specifically

---

[13] We note that "the typical rules of statutory interpretation" are used "to interpret the Guidelines." *United States v. Stanford*, 883 F.3d 500, 511 (5th Cir. 2018). Thus, "[i]f the language is unambiguous, and does not lead to an absurd result, the court's inquiry begins and ends with the plain meaning of that language." *Id.* (internal quotation marks and citation omitted). Further, a guideline, like a statute, "is to be read as a whole" since its "meaning . . . , plain or not, depends on context." *Id.* (internal quotation marks and citation omitted).

No. 17-10920

address Defendants' recurring, baseline argument that their offenses did not implicate *any* loss contemplated by application note 3. Nor did she explicitly find that Defendants' intended for pecuniary harm to result from their conspiracy to defraud the government or their conspiracy to commit mail fraud, or that either offense resulted in an actual loss. *See id.* Perhaps the finding was implicit. If so, this is not clear from the record before us. To the contrary, it appears from the sentencing transcript that the district court simply accepted as a foregone conclusion that an actual loss resulted from the mail-fraud conspiracy and proceeded directly to the question of the appropriate method for calculating the amount of the loss.

We hold that the district court erred in applying the 20-point enhancement to Defendants' base offense levels under U.S.S.G. § 2B1.1(b)(1) without making an explicit primary finding, supported by a preponderance of the evidence before it, *Muniz*, 803 F.3d at 712, that either the Count-1 or Count-2 offense in fact resulted in an actual loss, or, alternatively, that there was an intended loss related to one or both offenses, as defined by application note 3(A).[14] *See id.* at § 2B1.1(b)(1) cmt. n.3(A); *see also U.S. v. Bazemore*, 839 F.3d 379, 390 (5th Cir. 2016) ("District courts must take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause.") (internal quotation marks and citations omitted)). Such a finding was particularly critical here, where the government did not identify any specific victims of Defendants' offenses, and it was established that most of B&B's customers were complicit in Defendants' fraudulent activity. Because the

---

[14] We note that our ruling with respect to the 20-point base-offense-level enhancement does not have any bearing on the district court's forfeiture order. Though in his brief, Bays insinuates that if the district court erred in applying the 20-point enhancement based on loss resulting from the offense, then it erred in issuing a forfeiture order, he does not brief this issue. Moreover, the court's forfeiture determination was not dependent on its loss determination.

government has not established that the district court's error was harmless—*i.e.* "that the district court would have imposed the same sentence had it not made the error . . . for the same reasons it gave at . . . sentencing"—we remand this matter for the district court to conduct further proceedings consistent with our ruling. *United States v. Juarez*, 812 F.3d 432, 437–38 (5th Cir. 2016).

## IV.

Bays argues that the district court also erred by enhancing his base offense level by two points under U.S.S.G. § 2B1.1(b)(10)(A) for relocating his "fraudulent scheme to another jurisdiction to evade law[-]enforcement or regulatory officials." U.S.S.G. § 2B1.1(b)(10)(A) (2014). The enhancement was based on the fact that Bays moved B&B's production-and-manufacturing facility from Fort Wayne, Indiana to Defiance, Ohio in approximately May 2013 in response to Indiana's enactment of stricter laws pertaining to synthetic drugs. Bays argued below that he moved his business to comply with the law—not to evade it. The government responded that Bays's intent to evade law enforcement is evidenced by the fact that, after moving his business to Ohio, Bays continued to sell B&B's products to customers in Indiana despite its new, harsher synthetic-drug laws. The district court overruled Bays's objection, inferring from the circumstances and the sophisticated manner in which Bays handled his business that evading law enforcement was at least one of Bays's reasons for moving B&B's operations.

Bays makes a different argument on appeal. Relying on resentencing testimony of FBI Agent Paul Pearre, Bays asserts that he was the alter ego of B&B, or vice versa. He further contends that though he moved his business, he continuously resided in Ft. Wayne, Indiana until the DEA raided and shutdown B&B at its Defiance, Ohio location. He argues that if he had wanted to evade state and local officials he would not have continued residing within

No. 17-10920

their jurisdiction, particularly since Indiana authorities knew where he resided after having previously searched his home.

Because the substance of Bays's objection to the two-point "evading[-]authorities" enhancement on appeal differs materially from his objection to such enhancement before the district court, we review the district court's application of the enhancement for plain error. *See United States v. Escobar*, 866 F.3d 333, 337 (5th Cir. 2017) (applying plain-error review where the appellant made a similar, but not the same, challenge to the calculation of his criminal-history category in the district court as on appeal); *see also United States v. Mondragon-Santiago*, 564 F.3d 357, 361 (5th Cir. 2009) (holding that a party must raise a claim of error in a manner sufficient to alert the district court to the specific error). Under the plain-error standard, Bays has not shown that the district court made a "clear or obvious" error in applying the two-point enhancement. *See Mondragon-Santiago*, 564 F.3d at 361.

First, application of the U.S.S.G. § 2B1.1(b)(10)(A) enhancement depends on movement of the "fraudulent scheme" to another jurisdiction. *See* U.S.S.G. § 2B1.1(b)(10)(A) (2014). Although Bays maintained his residence in Indiana, he undisputedly moved the B&B facility, from which he carried out most, if not all, of his "fraudulent scheme," *i.e.* manufacturing and selling mislabeled synthetic marijuana, from Indiana to Ohio.[15]  Additionally, evidence presented at trial, including testimony of former B&B employee Aaron Parrish, which was referenced by the district judge during resentencing, supports the court's factual determination that Bays moved his company, at least in part, to evade law enforcement. Specifically, Mr. Parrish testified that

---

[15] Former B&B employee Aaron Parish testified that, while at one point the sales portion of B&B's business was conducted from Bays's home, in early 2013, B&B's production facility was moved to a new location within Indiana that was large enough to also house the sales department of the business. Therefore, when B&B moved from Indiana to Ohio a few months later, both the production and sales components of the business were moved to Ohio.

No. 17-10920

Bays moved B&B due to a "look[-]alike law" that was about to be passed in Indiana, that Bays instructed employees to continue to sell B&B products in Indiana after the move against the will of several employees, and that the move occurred shortly after Indiana authorities raided the Indiana B&B facility. Thus, it was not a "clear or obvious" error for the court to reach the conclusion it did. *See Mondragon-Santiago*, 564 F.3d at 361; *Puckett*, 556 U.S. at 135. Indeed, the court's conclusion regarding Bays's intent was "[plausible] in light of the record as a whole." *Muniz*, 803 F.3d at 712 (internal quotation marks and citation omitted). Thus, Bays's objection fails even under clear-error review. *Id.*

## V.

Finally, Bays objects to the district court's inclusion of a 1994 child-molestation offense in his criminal history, arguing that the offense falls outside of the relevant time period. As a preliminary response to Bays's objection, the government contends that Bays is barred by the "mandate rule"[16] from challenging his criminal-history category since he could have, but did not, raise such challenge in connection with his original sentencing. While the government's argument is convincing, we decline to address in detail the applicability of the mandate rule here, since Bays's challenge to his criminal-history determination itself lacks merit.

Under U.S.S.G. § 4A1.2(e)(1), "[a] prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense" is counted in a criminal-

---

[16] The "mandate rule," which is "a specific application of" the "law of the case" doctrine, "compels compliance on remand with the dictates of a superior court and forecloses re[-]litigation of issues expressly or impliedly decided by the appellate court" absent "exceptional circumstances." *U.S. v. Lee*, 358 F.3d 315, 320–21 (5th Cir. 2004) (internal quotation marks and citation omitted).

history calculation.  U.S.S.G. § 4A1.2(e)(1) (2014).  Likewise, "any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period" is counted.  *Id*.  Under U.S.S.G. § 4A1.2(k)(2), in the case of parole and revocation of parole, "the date of last release from incarceration on such sentence" is determinative as to whether the sentence of imprisonment falls within the fifteen-year period.  *Id*. at § 4A1.2(k)(2).

Bays plead guilty to the child-molestation offense in an Indiana court on January 27, 1994.  He was sentenced to four years in prison.  He was paroled on January 17, 1996.  His parole was revoked on September 13, 1996.  He was again paroled on May 15, 1997 and discharged from parole on January 16, 1998.  While Bays previously argued that his initial parole period should not be considered in determining when his sentence ended, he now correctly concedes that May 15, 1997—the date on which he was paroled for the second time—is the correct date from which to determine whether his child-molestation conviction should be considered in his criminal-history computation.  *See* U.S.S.G. § 4A1.2(k)(2) (2014).  Instead, he urges on appeal that the district court erred in accepting June 4, 2011 as the onset date of the instant offense.  Because Bays's argument on appeal differs materially from the arguments he made below, we review the district court's determination of Bays's criminal-history category for plain error.  *See United States v. Nesmith*, 866 F.3d 677, 679 (5th Cir. 2017) ("[W]hen a defendant objects to his sentence on grounds different from those raised on appeal, we review the new arguments raised on appeal for plain error only." (internal quotation marks and citation omitted)); *Escobar*, 866 F.3d at 337.

Bays contends that May 16, 2013 is the earliest date that can be considered the onset date for the instant offense since that is the date "when certain substances" used by B&B in its spice manufacturing "were scheduled

on the lists of the CSA." According to Bays, "it was legally _im_possible for any distribution of these substances to be unlawful earlier than [that time], so the relevant conduct period can_not_ begin any earlier than May 16, 2013." Thus, Bays asserts that the relevant date for his child-molestation offense—May 15, 1997—falls outside of the 15-year window, which began, according to Bays, 15 years prior to the inception of the current offense on May 16, 1998.

Bays's suggestion that the date on which chemicals used in B&B's business were scheduled is controlling with respect to the inception date of the instant offense is both disingenuous and contradictory, given that he was resentenced on conspiracy-to-commit-fraud offenses—not drug offenses—and his adamant assertions that this is not a controlled-substance case. Application note 8 to U.S.S.G. § 4A1.2 states that the term "commencement of the instant offense" as used in § 4A1.2(e)(1) includes "any relevant conduct," as defined by § 1B1.3. According to the third addendum to Bays's PSR, which the district court adopted, B&B business records established that between June 4, 2011 and August 2013 B&B marketed and sold millions of dollars' worth of synthetic cannabinoid products that were intended to be smoked but contained "materially false labeling of 'insence,' 'potpourri,' 'air freshener,' or 'aroma therapy,' and 'not for human consumption'." The factual finding that B&B was engaged in relevant conduct as early as June 2011 is further supported by evidence presented at trial. For instance, Aaron Parish testified regarding the contents of a B&B Quickbooks report showing B&B sales from June 2011 through August 27, 2013 and confirmed that Bays and B&B employees knowingly put false labels on B&B's products.

Having the foregoing information before it, the district court did not make a "clear or obvious" error in determining that the instant offense began on June 4, 2011 and that Bays's child-molestation conviction parole date of May 15, 1997 falls within 15 years of the start of the instant offense, allowing

such conviction to be included in Bays's criminal-history category. *See Mondragon-Santiago*, 564 F.3d at 361; *see also United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (recognizing that PSRs generally "bear[] sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations" (internal quotation marks and citation omitted)); *Anderson*, 560 F.3d at 283 (noting that sentencing enhancements must be supported by a preponderance of the evidence).

## VI.

As discussed herein, we conclude that the district court reversibly erred in applying a 20-point enhancement to Defendants' base offense levels under U.S.S.G. § 2B1.1(b)(1)(k) without first making a determination that an actual loss resulted from one or both of their offenses, or that Defendants intended for a loss to result from one or both of their offenses. On this basis alone, we VACATE Defendants' sentences and REMAND this matter to the district court for further proceedings consistent with this opinion.